# United States Court of Appeals
## For the First Circuit

No. 17-2200

CHARLENE RICHARD,

Plaintiff, Appellant,

v.

REGIONAL SCHOOL UNIT 57,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Torruella, Lynch, and Kayatta,
Circuit Judges.

Richard L. O'Meara, with whom Stacey D. Neumann and Murray, Plumb & Murray were on brief, for appellant.
Jeana M. McCormick, with whom Melissa A. Hewey and Drummond Woodsum were on brief, for appellee.

August 21, 2018

**KAYATTA**, **Circuit Judge**.  Charlene Richard, formerly a kindergarten teacher at Waterboro Elementary School, sued Regional School Unit 57 ("RSU 57"), claiming that by retaliating against her for her advocacy on behalf of students with disabilities, it violated the Americans With Disabilities Act, Rehabilitation Act, Maine Human Rights Act, and Maine Whistleblower Protection Act. After a five-day bench trial and post-trial briefing, the district court largely credited Richard's version of events, but nevertheless found that she had not met her burden of proving that the adverse actions she suffered came as a result of her advocacy. Accordingly, the district court entered judgment for RSU 57. Seeing no clear error in the district court's well-explained findings, we affirm.

## I.

In 2006, Charlene Richard began teaching full-time at Waterboro Elementary School.  Prior to the conclusion of the 2013–14 school year, Richard received positive reviews of her teaching. She had no complaints from parents, colleagues, or the school, and had no reprimands on her employment record.  In short -- as the district court found -- her record was exemplary.

Richard usually had a few special education students assigned to her classroom each year.  When she was assigned such a student, her practice was to review the student's Individualized Education Plan ("IEP") and contact the student's parents.  In

addition to managing students who already had IEPs, Richard was often in a position to determine whether other students had potential learning disabilities warranting referral to appropriate professionals for intervention.

In the relevant time period, special education in RSU 57 worked as follows:  Students in need of special education fell into three categories:  (1) those previously identified as qualifying for special education, (2) those not previously identified as qualifying but suspected of qualifying through testing, and (3) those not previously identified as in need of special education or suspected of qualifying via testing, but subsequently identified as potentially in need of special education.  Though RSU 57 relied upon teachers to identify students in need of assistance, it encouraged those teachers, prior to referring a student to the IEP team, to use a process called "Response to Intervention" ("RTI").  RTI is a four-tiered process involving escalating support for students potentially in need of special education, the goal of which is to help a student without formally labeling him or her as disabled and creating an IEP. However, parents have a legal right to refer their children to the IEP team at any time and avoid the RTI process entirely.

Issues concerning Richard's interaction with the special education system arose in 2012, when she expressed concern that a student in her class may have been in need of special education.

The student was ultimately diagnosed with autism and placed in a special program. Then, in March 2014, a student known as K.M. transferred to Waterboro Elementary School ("WES") and joined Richard's class. Richard had received no information about this student and was not able to contact his parents, but noted various disturbing behaviors. When she contacted K.M.'s teacher from his prior school, she learned that K.M. had issues there as well, and was being fast-tracked into RTI tier three prior to his transfer. When Richard sought help from the WES administration, the administration only offered the prospect of buzzing the principal's office if K.M. became violent.

Prior to the 2014-2015 school year, Richard learned that her class would contain three students -- K.N., G.T., and L.S. -- previously identified as requiring special education. Richard was concerned that her class would be too large to allow her to effectively support these students. In addition, despite making multiple requests, Richard did not receive copies of these student's IEPs until after the school year had already begun. After the year started, it became clear that two other students in her class -- T.K. and L.P. -- might also be in need of intervention. These students were sometimes violent, and targeted two other students -- B.D. and C.S. -- in particular. A behavior specialist was brought in to assist with the situation; she checked in from time to time on the class, created a "behavior plan" for L.P., and

- 4 -

suggested using the same plan for T.K., without conducting an independent assessment of T.K. Later that year, Richard reported seeing this behavioral specialist holding the door to the "break room" -- a secluded room where students having difficulty could go -- closed, and reported overhearing the same specialist requesting that a janitor remove the interior handle on the door.[1] The administrative procedures manual for RSU 57 prohibited such actions.

As the year went on, it became clear that T.K. and L.P.'s behavior was a significant issue. Many parents complained, and in December, C.S.'s parents emailed Richard, as well as Principal Christine Bertinet, to inform them that T.K. had tried to pull down C.S.'s pants and had previously turned hot water on C.S. while she washed her hands. In addition, Richard became aware that L.P. had thrown a chair at B.D. On December 2, 2014, the same day C.S.'s parents sent the email, Richard filled out a form referring T.K. and L.P. to the Student Assessment Team ("SAT"), a group tasked with helping students with behavioral issues.

B.D.'s mother, angered at what she perceived as unsafe classroom conditions, called Superintendent John Davis on

---

[1] Richard reported this incident after Principal Bertinet, Vice Principal Roberts, and the behavioral specialist demanded that Richard complete a "seclusion report" for L.P., even though she had never taken him or any other student to the break room as a disciplinary measure.

December 4, 2014, and told him that B.D. had been subjected to physical abuse. She was complimentary toward Richard, but wanted to know how RSU 57 planned to address the situation. She requested a meeting to address the issue and one was scheduled.

The next day, Superintendent Davis emailed Richard, Principal Bertinet, Vice Principal Melissa Roberts, and Clinton Nash, Richard's union representative, to set up a meeting for the group to discuss issues in Richard's classroom. At the meeting, Superintendent Davis accused Richard of breaching student confidentiality with parents. Superintendent Davis then told Richard that she was "pathetic," that RSU 57 had wasted ten years on her, and that if she could not handle twenty or more students, they would find her a job she could handle. Superintendent Davis said that parents had been complaining about Richard for years, though he declined to identify any such parents when Richard pressed the issue. Superintendent Davis denied that several incidents said to have occurred in Richard's classroom had ever happened, told Richard, "You are the problem, not the boys," and stated that an educational technician would be the "eyes and ears" of the administration, observing Richard. Superintendent Davis ended the meeting by telling Richard to "get back to class and teach."[2]

_____

[2] Perhaps unsurprisingly, Superintendent Davis's recollection of this meeting was quite different. However, the district court

- 6 -

After the meeting, Principal Bertinet gave Richard a memorandum, and placed a copy of this memorandum in Richard's personnel file, outlining an expectation that Richard would implement the behavior plan in her classroom, work with her and Vice Principal Roberts on behavior management techniques, and keep the administration abreast of all parent communications. The memorandum also expressed concern that Richard was not implementing the behavior plan. Richard responded, asking Principal Bertinet to be more specific about any ways in which Richard was failing to implement the behavior plan. Ultimately, Principal Bertinet revised the memorandum to eliminate the portion referring to Richard's failure to implement the behavior plan.

Behavioral issues persisted in Richard's classroom. In response, Richard sought assistance, arguing that the administration unduly minimized the fact that T.K. was targeting another student, B.D.

At some point during the course of these events, Superintendent Davis said to Nash, "What is it I need to do to

---

credited Richard's testimony as to what happened in the meeting, not Superintendent Davis's, finding his conduct in the meeting to be "accusatory, derogatory, and unprofessional." Richard v. Reg'l Sch. Unit 57, 296 F. Supp. 3d 274, 306 (D. Me. 2017). Superintendent Davis himself admitted that he was "frustrated and angry" during the meeting. Id. at 293. These facts are consistent with other testimony about the meeting, id. at 291-94, and RSU 57 does not now challenge the district court's findings as to what occurred at the meeting.

have Charlene Richard resign?" Eventually RSU 57 transferred Richard to a different school and placed her on a performance improvement plan. Richard then sued, alleging that RSU 57's actions amounted to retaliation against her for her advocacy for disabled students.

The district court held a five-day bench trial on the matter. It then solicited post-trial briefing from both parties. In November 2017, it issued a sixty-seven page decision containing findings of fact and conclusions of law. Richard v. Reg'l Sch. Unit 57, 296 F. Supp. 3d 274 (D. Me. 2017). In its factfinding, the district court largely credited Richard's version of events. It then chose to structure its analysis of the evidence by using the method adopted in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), for analyzing motions for summary judgment in discrimination cases.

As the district court itself noted, there is some question as to whether the McDonnell Douglas analysis is even useful at the trial stage. Richard, 296 F. Supp. 3d at 277–78, 301. We have noted that once a plaintiff makes out a prima facie case, "the McDonnell Douglas framework, with its intricate web of presumptions and burdens, becomes an anachronism. The [factfinder], unaided by any presumptions, must simply answer the question of whether the employee has carried the ultimate burden of proving retaliation." Palmquist v. Shinseki, 689 F.3d 66, 71

- 8 -

(1st Cir. 2012) (citations omitted).  And because a plaintiff who defeats summary judgment must have offered, at that stage, enough evidence to meet its burden of production on the prima facie case, examples of plaintiffs who make it to trial but fail to present a prima facie case will be few and far between.  In short, once a case has reached trial, the McDonnell Douglas analysis has virtually no work left to do.

The Ninth Circuit has reasoned similarly, noting that once each party meets its burden of production, the McDonnell Douglas framework is no longer relevant.  See Sanghvi v. City of Claremont, 328 F.3d 532, 537 (9th Cir. 2003) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510 (1993)).  The Tenth Circuit has gone even further, stating that "the three-part McDonnell Douglas burden-shifting analysis is limited to the summary judgment context.  Once there has been a full trial on the merits, the sequential analytical model adopted from McDonnell Douglas . . . drops out and we are left with the single overarching issue whether plaintiff [met her burden of persuasion]."  Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1226 (10th Cir. 2000) (ellipsis in original) (internal quotation marks omitted) (quoting Fallis v. Kerr-McGee Corp., 944 F.2d 743, 744 (10th Cir. 1991)).

Be that as it may, in this particular case neither party complains that the district court -- at the parties' joint behest -- employed the McDonnell Douglas mode of analysis.  In so

proceeding, the court first asked whether Richard made out a prima facie case of retaliation, then whether RSU 57 articulated a nonretaliatory reason for its actions, and if so, whether Richard demonstrated that the nonretaliatory reason was in fact pretext. See McDonnell Douglas, 411 U.S. at 802-07. The district court found that Richard had made out a prima facie case and that RSU 57 had offered a legitimate reason for its actions (Superintendent Davis's frustration with Richard and other professionals' inability to manage the kindergarten classroom at issue). The court also found that Richard demonstrated that this reason was pretextual, given that Superintendent Davis had taken no action against any other education professional at Waterboro Elementary School as a result of the issues in Richard's classroom. Richard, 296 F. Supp. 3d at 300-02.

Having found that the reason given by RSU 57 for its adverse actions against Richard was untrue, the district court turned to the ultimate question: Had Richard proved that it was more likely than not that her advocacy for students with disabilities had actually prompted the actions against her? The district court was unconvinced. It explained, most notably, that it found scant evidence that Superintendent Davis was even aware of Richard's advocacy as of the December 8, 2014 meeting. It even found the evidence "equivocal at best as to whether . . . Davis was aware that Ms. Richard had completed the SAT paperwork for

T.K. and L.P." Id. at 306. The district court also found that advocacy for a handful of children with disabilities was not the type of activity that was likely to have prompted Superintendent Davis's ire. Id. at 302-04. RSU 57 routinely referred 80 to 120 students for education services each year, with most of the referrals coming from kindergarten. During the year relevant here, there were only 80 referrals, with no evidence that a few more would have been unusual or caused any budgetary pressure. Id. at 302. Nor was the district court convinced that there was "anything about the characteristics of either T.K. or L.P. that would have caused RSU 57 any specific budgetary concern." Id. The district court then analyzed several other possible causes of Superintendent Davis's animosity toward Richard, concluding that the only explanation that was not "inexplicable" was that Superintendent Davis was perhaps operating on the incorrect impression that Richard was unable to manage her classroom. Id. at 307. But as the district court noted, this did not mean that his actions came as a result of Richard's advocacy. As for other possible indicia or sources of bias that may have influenced Superintendent Davis, the district court found that none existed. Id. It also found that Principal Bertinet and Vice Principal Roberts, though hostile to Richard, appeared to be doing Superintendent Davis's bidding, rather than acting out of any animus connected with Richard's advocacy. Id. at 304. The

- 11 -

district court entered judgment for RSU 57, and this appeal followed.

## II.

### A.

Richard makes only one argument that at least plausibly claims legal, rather than factual, error.  Richard contends that the district court improperly required her to present evidence of causation beyond that which supported her prima facie case.  Citing Lang v. Wal-Mart Stores East, L.P., 813 F.3d 447, 457 (1st Cir. 2016) and Dichner v. Liberty Travel, 141 F.3d 24, 30 (1st Cir. 1998), she posits that once a district court has found an employer's reason for acting to be pretextual, the court must find a violation.

This argument confuses two concepts:  what the evidence permits a factfinder to do, and what the evidence compels a factfinder to do.  Richard is correct that once a factfinder is satisfied that an employer's reasons for taking an adverse action are pretextual, it may find for the plaintiff on causation without further evidence.  See Lang, 813 F.3d at 458.  But Richard cites no authority for the proposition that once pretext is established, a factfinder must find in the plaintiff's favor.  To the contrary, Lang states that "rejection of the employer's proffered reasons will permit, though not compel, the trier of fact to infer the ultimate fact of [retaliation]."  Id. (emphasis added)

- 12 -

(alterations omitted) (quoting In re Seacoast Fire Equip. Co., 777 A.2d 869, 873 (N.H. 2001)).

Nothing in the record compels the conclusion that the district court misunderstood these precedents and believed that Richard was required as a matter of law to produce additional evidence beyond that which established pretext. Rather, the district court thoughtfully explained that while Richard had presented evidence sufficient to show RSU 57's reasoning to be pretextual, this evidence alone did not convince the court that RSU 57's true reason for acting was to retaliate against Richard. In so doing, the district court pointed to our decision in Palmquist, 689 F.3d at 71, which held that a plaintiff such as Richard needs to show that the proffered reason is "pretexual and that retaliation was the true reason." Richard, 296 F. Supp. 3d at 301 (emphasis added) (quoting Palmquist, 689 F.3d at 71). In short, the finding of pretext did not guarantee Richard a win, and the district court did not misunderstand the law.

## B.

Richard's remaining arguments fall into two categories: (1) the district court "failed to consider" certain evidence, proposed inferences, or arguments raised by Richard; or (2) the district court erred in its factual findings based on what it did consider. We deal with these two categories of argument in turn.

- 13 -

**1.**

We address first Richard's various arguments that the district court failed to consider certain points Richard says it should have considered. Richard makes this type of argument in various versions at least seven times in her opening brief. But in arguing that the district court failed "to consider" a point, Richard makes no claim that the trial judge slept through the trial. Rather, what she appears to mean is that the district court's written opinion did not expressly acknowledge and address certain points in her favor.

Federal Rule of Civil Procedure 52 dictates the manner in which district courts should state the result following a bench trial. It requires that the district court "find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). These findings and statements may on occasion provide a toehold for a successful appeal because they reveal a clear and consequential error in the trial court's factfinding. See Benham v. Lenox Sav. Bank, 292 F.3d 46, 48 (1st Cir. 2002) (reversing a judgment following a bench trial upon a determination that the court's judgment had been based on a theory offered by neither party and unsupported by the evidence).

None of this means, though, that a trial court's findings of fact need expressly respond like a debate champion to every evidentiary or factual contention made by the losing side. See

Nevor v. Moneypenny Holdings, LLC, 842 F.3d 113, 119 (1st Cir. 2016). As the application notes to the Rule's 1946 amendment state, "the judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts." Fed. R. Civ. P. 52(a), advisory committee's note to 1946 amendment. Rule 52 is "not meant to be applied mechanically," and where "the district court's decision contains sufficient findings and reasoning to make plain the basis for its disposition of the case," we pay little heed to claims that it should have done more. Valsamis v. González-Romero, 748 F.3d 61, 63 (1st Cir. 2014). Rather, we consider arguments such as contentions that the trial court misapplied the law, made plain errors of consequential fact, failed to make plain the facts and reasoning upon which it chose to base its conclusion, or rested that conclusion upon a record insufficient to provide the required support.

In view of the foregoing, we reject in bulk Richard's arguments that in one way or another rest only on a complaint that the trial court's sixty-seven page opinion did not mention or "failed to address" certain facts and assertions advanced by Richard.

**2.**

Richard marshals her claims of factual error in an effort to secure the reversal of the district court's finding that RSU 57

- 15 -

lacked retaliatory motive. "The issue of retaliatory motive . . . presents 'a pure question of fact,' and the trial court's determination is reviewed under the clearly erroneous standard." Hazel v. U.S. Postmaster Gen., 7 F.3d 1, 4 (1st Cir. 1993) (quoting Pullman-Standard v. Swint, 456 U.S. 273, 287–88 (1982)). We have made clear that "[f]ollowing a bench trial, an appellate tribunal is not warranted in substituting its judgment for that of the trial court. . . . [W]e are not free to reject . . . [the district court's] findings of fact . . . 'unless, on the whole of the record, we form a strong, unyielding belief that a mistake has been made.'" Foster v. Dalton, 71 F.3d 52, 55 (1st Cir. 1995) (quoting Cumpiano v. Banco Santander P.R., 902 F.2d 148, 152 (1st Cir. 1990)). And "[w]hen the evidence presented at a bench trial supports plausible but competing inferences, the court's decision to favor one inference is not clearly erroneous." Torres-Lazarini v. United States, 523 F.3d 69, 72 (1st Cir. 2008).

Richard argues first that the district court erred in declining to infer that resource considerations motivated RSU 57's actions. As Superintendent Davis testified, educating special needs students can be expensive. But as the district court noted, there was no evidence that RSU 57 was suffering from a budgetary squeeze and no evidence that T.K. and L.P. had unusually expensive special education needs, while there was evidence that T.K. and L.P. were in fact ultimately placed in special education programs.

- 16 -

Richard, 296 F. Supp. 3d at 303. From this, the district court inferred that it was unlikely that resource concerns motivated RSU 57's actions. We cannot deem this inference impermissible, and thus it was not reversible error for the district court to make it.

Richard next argues that the district court "should have held against RSU 57 the bureaucratic shell game involving who knew what and who decided what." She posits, citing Tejada-Batista v. Morales, 424 F.3d 97, 102 (1st Cir. 2005), that because multiple individuals (Principal Bertinet, Vice Principal Roberts, and Superintendent Davis) were involved in sanctioning Richard, the district court should have taken the so-called "sequence of actors" approach and imputed each individual actor's motivations to RSU 57. The problem for Richard is that the district court did precisely this, directing its attention specifically not just to Superintendent Davis, but also to the "motivation of Principal Bertinet and Vice Principal Roberts." Richard, 296 F. Supp. 3d at 304. Looking first at the time period prior to the December 8 meeting, the court found Principal Bertinet and Vice Principal Roberts to have been "collaborative and supporting" in dealing with Richard. Id. This was at a time when they already well knew of complaints and advocacy by Richard on behalf of students with disabilities. Only after the December 8 meeting, when they learned of Superintendent Davis's animus toward Richard, did they begin

- 17 -

behaving adversely toward Richard. Most reasonable people would conclude from this chronology that Richard's complaints raised no retaliatory ire in the two administrators. Rather, as the district court found, they changed their behavior to follow their boss's "lead." Id.

The district court also found that after learning of Superintendent Davis's wish "to find a way to get Ms. Richard to resign," the two administrators thereafter "engage[d] in a retributive campaign against Ms. Richard." Id. In so doing, they were "doing the perceived bidding of Superintendent Davis." Id. Emphasizing the point, the district court expressly found that Principal Bertinet and Vice Principal Roberts "were following Superintendent Davis's lead in exerting intense pressure on Ms. Richard from the time of the December 8 meeting to her April 2015 leave "of absence and beyond." Id.

As the district court explained, Principal Bertinet and Vice Principal Roberts not only took actions directed at Richard, but also at victims T.K. and L.P. The district court chronicled these events, aptly observing that the two administrators subsequently went "beyond merely following the superintendent's wishes." Id.

Our dissenting colleague seems to read this later observation as meaning that the two administrators undertook retributive actions against Richard for reasons other than

- 18 -

attempting to please Superintendent Davis.  But the district court neither said nor even implied such.  Indeed, the examples the district court cited of the two administrators going beyond Superintendent Davis's direction -- shifting blame from T.K. to B.D., minimizing T.K.'s inappropriate behavior, and contradicting tape recorded statements concerning a meeting with B.D.'s parents -- all concern hostility toward "the children who were victims of T.K. and L.P.'s aggressive conduct." Id.  Simply put, the district court plainly found that Principal Bertinet and Vice Principal Roberts consistently acted harshly toward Richard after December 8 for a single reason:  to do Superintendent Davis's bidding.  And the chronology strongly -- and certainly sufficiently -- supported this factual finding.

So we summarize:  The district court carefully considered and expressly discussed the motivations of the principal and vice principal, made clear why the chronology belied retaliation as the more likely motive, and expressed uncertainty as to what was otherwise going on concerning the whole situation with the children in question.  Based on the record, we see no clear error in this analysis.

Richard's final argument is that because the district court found RSU 57's explanation -- via Superintendent Davis -- for its actions to be pretextual, the court should have inferred that the true reason must have been retaliatory animus.  This

argument is functionally the same as the contention, rejected <u>supra</u>, that if a district court finds pretext, it necessarily must find retaliatory motive.  Though such an inference is permitted, it is not required, and the district court's failure to draw Richard's preferred inference was not clear error.

## III.

The bottom line is this:  The district court's sixty-seven page opinion sets forth more than sufficient findings and reasoning to make plain the basis for its disposition of the case.  Specifically, it explains in detail why the court was not persuaded that RSU 57 acted with animus prompted by Richard's advocacy for several students with disabilities.  And in so doing, it properly stated and applied the law, and did not clearly err in the facts it found or the inferences it drew.  This is what happens when a party tries well, but loses, a case that could have gone either way.  We therefore <u>affirm</u> the judgment.

**-Dissenting Opinion Follows-**

TORRUELLA, **Circuit Judge (Dissenting)**. Despite the formidable standard of review, see Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985) (stating that "a finding of intentional discrimination is a finding of fact," to which we apply the clear error review), where we have a "strong, unyielding belief that a mistake has been made," it is our duty to reverse or remand, Powell v. Alexander, 391 F.3d 1, 7 (1st Cir. 2004) (quoting Fed. Refinance Co. v. Klock, 352 F.3d 16, 27 (1st Cir. 2003)). I am of the firm belief that this is that rare case in which the district court's finding that there was no retaliatory animus was clearly erroneous. In light of the supported facts established by the district court, the weight of the evidence merited a closer look at the motivation of crucial actors in this story -- namely that of the WES administration. Therefore, I respectfully dissent.

The district court found the "heart of the case" to be the December 8, 2014 meeting, the site of the first identified adverse employment action. Richard v. Regional Sch. Unit 57, 296 F. Supp. 3d 274, 278 (D. Me. 2017). The district court found that "Superintendent Davis ran the District," and that Principal Bertinet and Vice Principal Roberts, the school's administrators, were simply "doing the perceived bidding of Superintendent Davis." Id. at 304-05. Accordingly, the district court imputed Superintendent Davis's motivation to all parties that took adverse

employment actions against Richard. But, contradicting its own findings, the district court also noted that the school administration took adverse employment actions without the Superintendent's direction. In particular, the district court "[found] that Principal Bertinet and Vice Principal Roberts were following Superintendent Davis'[s] lead in exerting intense pressure on Ms. Richard from the time of the December 8, 2014 meeting to her April 2015 leave of absence and beyond." Id. at 304. But later recognized that "[t]he actions by WES administration [went] beyond merely following the Superintendent's wishes." Id.

The majority reads the latter district court statement as limited to Principal Bertinet's and Vice Principal Roberts' actions "against the children who were victims of T.K. and L.P.'s aggressive conduct." Id. However, a careful reading of the district court's order leads us to conclude that Richard was also subject to such actions "beyond" the Superintendent's directions. First, the district court clearly stated that "unsupported positions" were taken against both Richard, and T.K. and L.P.'s victims. Id. ("[T]he troubling aspect of their joining in [Superintendent Davis's] campaign against Ms. Richard is that it led them to take unsupported positions against not only Ms. Richard but also against the children who were victims of T.K. and L.P.'s aggressive conduct." (emphasis added)). Given the context of this

statement, the term "unsupported positions" refers to the mental state that set the foundation for Principal Bertinet's and Vice Principal Roberts' actions "beyond . . . the Superintendent's wishes," as the district court described them immediately following examples of their actions taken against T.K. and L.P.'s victims.  Id.[3]  Second, the district court explicitly included Richard, along with one of T.K. and L.P.'s victims -- B.D., as one of the actors in the uncertain events it recognized unfolded in RSU 57.  Id. at 304-05 ("In sum, the evidence suggests that something was going on within the administration of RSU 57 concerning T.K., L.P., B.D., and Charlene Richard, but the Court is not sure what.").  Thus, if the uncertain activity in RSU 57 was related to the WES administration's actions "beyond" the Superintendent's direction against T.K. and L.P.'s victims, as the

---

[3]  To support its conclusion that the school administration took no action beyond Superintendent Davis's wishes against Richard, the majority points out the district court's omission of a specific example, in this particular part of its order, of a hostile act by Principal Bertinet and Vice Principal Roberts against Richard. See Maj. Op. 11 (citing Richard, 296 F. Supp. 3d at 304).  However, as is discussed in detail below, Principal Bertinet responded in a manner hostile towards Richard in the events surrounding two of the three examples provided by the district court and alluded to by the majority.  Despite playing no role in suggesting that B.D. was the culprit, Principal Bertinet sought to blame Richard for B.D.'s trip to the principal's office following the incident involving T.K. and a female classmate in which T.K. had hit the girl, Richard, 296 F. Supp. 3d at 295-96.  Furthermore, during the tape recorded meeting, Principal Bertinet openly lied to B.D.'s parents by stating that Richard had failed to report to her that B.D. was being targeted, id. at 297-98, thereby implying to the parents that Richard was not properly supervising her students.

majority seems to concede, it follows that Richard was also subject to such unsupported, and in her case adverse, action. Therefore, the district court should have, but did not, consider the Principal's and Vice Principal's motivations separate and apart from the Superintendent's. This was clearly erroneous in light of the district court's own findings.

We commonly look to certain indicators such as temporal proximity, awareness of the protected conduct, comments by decision makers, and differential treatment, as circumstantial evidence to guide a causation analysis. See Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991) ("[A] plaintiff should not be required to produce 'smoking-gun' evidence before prevailing in a discrimination suit. There are many veins of circumstantial evidence that may be mined by a plaintiff to this end."); Garayalde-Rijos v. Municipality of Carolina, 747 F.3d 15, 25 (1st Cir. 2014)) ("'[T]emporal proximity' is merely one factor relevant to causation . . . 'reinforced by other evidence.'" (quoting Trainor v. HEI Hospitality, LLC, 699 F.3d 19, 28 (1st Cir. 2012))); Alvarado v. Donahoe, 687 F.3d 453, 459 (1st Cir. 2012) (stating that knowledge is required for a retaliatory motive). An analysis of causation, however, is one where "[c]ontext matters." Planadeball v. Wyndham Vacation Resorts, Inc., 793 F.3d 169, 178 (1st Cir. 2015) (quoting Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 69 (2006)).

The concrete evidence in this case shows that, even if Superintendent Davis was not aware of Richard's advocacy at the time of the December 8, 2014 meeting, Principal Bertinet and Vice Principal Roberts both had knowledge of Richard's actions and took adverse employment actions against this exemplary kindergarten teacher. Superintendent Davis's hostile treatment at the December 8 meeting may have been the first, but was most certainly not the only, adverse employment action taken. Yet, the district court's causation analysis only considered the temporal proximity between Richard's filing of the SAT requests for T.K. and L.P. and the December 8 meeting.

The hostility by the school administrators continued throughout the spring of 2015 without proven command or knowledge by Superintendent Davis. In the district court's own words, "Principal Bertinet and Vice Principal Roberts began micromanaging Ms. Richard's classroom, criticizing her asserted failures, and building a case for administrative sanction by reprimands." Richard, 296 F. Supp. 3d at 279. The hostility was most evident in Principal Bertinet's misleading expressions to Richard's detriment. For instance, when Richard went to Principal Bertinet's office to inform her that T.K. had hit a female classmate, Principal Bertinet "sought to deflect blame from T.K. to B.D." Id. at 304. When B.D.'s parents inquired of the administration about why B.D. was being pulled out of the classroom and whether

B.D. was being targeted by the administration, Principal Bertinet told them that it was "simply a friendly check-in" and attempted to blame Richard for miscommunication, despite no evidence of such. See id. at 295-96. In another incident, when Principal Bertinet emailed B.D.'s parents to alert them that T.K. stepped on B.D.'s hand, Bertinet insisted it was an accident despite Richard's report to the contrary. Id. at 296. More overtly, at the tape-recorded meeting with B.D.'s parents on April 3, 2015, Principal Bertinet openly lied to B.D.'s parents that "[t]hat [was] the first time that Ms. Richard ha[d] said that she felt that [B.D.] was being targeted," despite the fact that Richard had reported this bullying to the administration the previous day. See id. at 297-98. Three days after this meeting, Principal Bertinet placed Richard on a Corrective Action Plan. Id. at 304. These incidents occurred five months after the December 8 meeting. The motivation of the WES administration is therefore of crucial importance to the ultimate causation analysis of retaliation in this case.

Despite these and other independent actions by the school's administrators, the district court inexplicably and summarily ended its analysis into the motivation of the WES administration by stating "the evidence suggests that something was going on within the administration of RSU 57 concerning T.K., L.P., B.D., and Charlene Richard, but the Court is not sure what. The Court turns to Superintendent Davis." Id. at 304-05. The

district court did not consider the temporal proximity of these school administrator's adverse employment actions to Richard's advocacy, but instead only focused on the temporal proximity of the December 8 meeting. While the administration's actions may only be circumstantial evidence of a retaliatory animus, the temporal proximity between Richard's advocacy and those actions can and should have been used in the district court's causation analysis. Sánchez-Rodríguez v. AT&T Mobility P.R., Inc., 673 F.3d 1, 15 (1st Cir. 2012) ("Very close temporal proximity between protected activity and an adverse employment action can satisfy a plaintiff's burden of showing causal connection . . . ."); see, e.g., DeCaire v. Mukasey, 530 F.3d 1, 21 (1st Cir. 2008) (using temporal proximity to find factual error in court's ultimate conclusion regarding causation).

Further, in its causation analysis, the district court erroneously considered only whether Superintendent Davis's pretextual explanation for his behavior provided evidence of a retaliatory motive, but failed to consider the pretextual explanation that the school administration put forth. See Zapata-Matos v. Reckitt & Colman, Inc., 277 F.3d 40, 45 (1st Cir. 2002) ("[D]isbelief of the reason may, along with the prima facie case, on appropriate facts, permit the trier of fact to conclude that the employer had discriminated."). Although the district court did mention RSU 57's proffered motivation at the very initial prima

facie stage, it wholly failed to review the administration's justification for their actions when considering whether Richard met her ultimate burden of persuasion. Compare Richard, 296 F. Supp. 3d at 300-01 (explaining that the administration articulated a nondiscriminatory reason for its actions), with id. at 301-02 (looking only to Superintendent Davis's motivations in its causation analysis). As illustrated above, Principal Bertinet and Vice Principal Roberts both participated in and influenced the adverse employment actions, and thus their motivation -- and whether their proffered nondiscriminatory justification was pretextual -- was also relevant and should have been analyzed by the district court. See, e.g., Webber v. Int'l Paper Co., 417 F.3d 229, 236 (1st Cir. 2005) (analyzing animus of each participant that influenced an adverse employment action); Cariglia v. Hertz Equip. Rental Corp., 363 F.3d 77, 85-88 (1st Cir. 2004) (stating that the district court should have reviewed the animus of an employee that may have manipulated the information provided to the ultimate decisionmakers). The district court's failure to do so was clearly erroneous. An analysis of RSU 57's proffered reasons for its actions may have supported Richard's argument that the adverse actions were motivated by her advocacy. See Kosereis v. Rhode Island, 331 F.3d 207, 214 (1st Cir. 2003) ("Evidence that the employer's stated reasons for its actions are pretextual can be sufficient to show improper motive.").

When the record is reviewed in its entirety, the retaliatory inference is apparent. The more incidents Richard reported to the school administration, the more the administration intensified the pressure that it exerted on Richard instead of providing the requested aid for the students for whom Richard was advocating. See DeCaire, 530 F.3d at 21 (lack of hostility prior to protected conduct supports inference of retaliatory animus). The district court's failure to consider the school administrator's motivations to determine whether Richard had proven her retaliation claims was clearly an error.

Kindergarten teachers are the first in line for the identification and proper treatment of children with disabilities within our school systems. The education system, parents, and society as a whole rely on those kindergarten teachers to advocate for children's needs and to create a safe environment in the classroom. Teachers, however, cannot be expected to shoulder this weight alone, but need the support of our school systems to help those students develop essential skills that they will employ for the rest of their lives. Richard was an exemplary teacher, and in some instances "the only positive force" in these children's lives. Richard, 296 F. Supp. 3d at 296. RSU 57 not only unjustifiably disrupted her efforts to provide support for the children, but waged a campaign of adverse employment actions in retaliation. I am therefore left with a "definite and firm conviction that a

mistake has been committed."  United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948).  I respectfully dissent.