STATE POLICE ASSOCIATION OF
MASSACHUSETTS, Petitioner,
Appellant,

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent,
Appellee.

No. 97–1319.

United States Court of Appeals,
First Circuit.

Heard July 3, 1997.

Decided Aug. 20, 1997.

Alfred J. O'Donovan, with whom Michelle H. Blauner and Shapiro, Haber & Urmy were on brief, for petitioner, appellant.

Teresa T. Milton, Attorney, Tax Division, U.S. Dep't of Justice, with whom Loretta C. Argrett, Assistant Attorney General, and Kenneth L. Greene, Attorney, Tax Division, were on brief, for respondent, appellee.

Before SELYA and LYNCH, Circuit Judges, and POLLAK,* Senior District Judge.

SELYA, Circuit Judge.

In this case, the Commissioner of the Internal Revenue Service (the Commissioner) issued a deficiency notice to the State Police Association of Massachusetts (the Association) for income taxes allegedly due but unpaid. When the Association protested, the Tax Court sided with the Commissioner. *See State Police Ass'n of Mass. v. Commissioner,* 72 T.C.M. (CCH) 582 (1996) (Tax Ct.Op.). The Association appeals, contending that the Tax Court erred both in finding that the deficiency assessment was timely and in holding that certain of the Association's activities gave rise to liability for unrelated business income tax. We affirm.

## I. BACKGROUND

The Association is a labor organization, and, as such, is exempt from income taxes under 26 U.S.C. § 501(c)(5) (1994).[1] The purpose of the organization is to represent its members in bargaining over the terms and conditions of their employment and to promote a fraternal spirit among members.

---

* Of the Eastern District of Pennsylvania, sitting by designation. .

1. From this point forward, we will refer to the applicable provisions of the Tax Code, as they appeared on the date(s) in question, by using the preface "IRC." To illustrate, 26 U.S.C. § 501(c)(5) will be cited as IRC § 501(c)(5), and so on and so forth.

Virtually all the troopers who are eligible to join the Association do so.

During the years at issue, the Association published an annual yearbook, known as *The Constabulary.* The yearbook consisted of photographs, articles, display advertisements, and a business directory. We describe *infra* the sales effort (which the Association in more salubrious times called the "earnings program") and the mechanics of publication and distribution. It is enough for now to say that the earnings program proved to be aptly named: gross receipts related to the publication of *The Constabulary* for the years at issue totalled $8,788,211. Of this amount, the Association retained somewhat over 40% (the precise percentage varied from year to year, and is of no consequence here). The Association paid no tax on the income.

It is said that all good things come to an end. Federal law requires that an otherwise tax-exempt organization must pay federal income tax on income derived from business ventures which are not substantially related to its tax-exempt purpose(s). *See* IRC § 511. After due investigation, the Commissioner concluded that the Association had violated this stricture because the sale of advertising in *The Constabulary* yielded taxable income. Acting on this conclusion, the Commissioner issued a deficiency notice seeking $1,352,433 in taxes due for the tax years ended April 30, 1986 through April 30, 1989, the three months ended July 31, 1989, and the tax years ended July 31, 1990 and 1991, along with additions to tax and penalties totalling $711,075.

Displeased by this turn of events, the Association brought suit in the Tax Court under IRC § 6213(a) to obtain a redetermination of the taxes allegedly due. It claimed that, for certain tax years, the notice of deficiency had been issued beyond the applicable limitation period; and that, on a broader plane, the activity cited by the Commissioner—the solicitation, sale, and publication of display ads and listings in *The Constabulary*—did not constitute an unrelated trade or business regularly carried on, and that, therefore, the income derived from that activity was exempt from tax. The Tax Court rejected both of these and sustained the Commissioner's

determination of the existence and extent of the deficiency (although it eliminated the additions to tax and the penalties). *See* Tax Ct.Op. at 589, 594. This appeal ensued.

## II. THE PUTATIVE TIME BAR

■ The Association claims that the statute of limitations bars the collection of taxes as to some or all of the affected periods. The relevant facts are not in dispute. On August 3, 1992, the Association and the Commissioner, through their authorized representatives, executed a form entitled "Consent to Extend the Time to Assess Tax" (the Form). The Form, a copy of which is reprinted in the appendix, permitted the Commissioner to assess income tax on or before April 30, 1993, for the contested periods through July 31, 1989. The Commissioner assessed the taxes allegedly due for these periods by issuing a deficiency notice on April 22, 1993. The applicable limitation period is three years. *See* IRC § 6501(a). If the Form sufficed to extend the limitation period, then the deficiency notice was timely as to all the tax years at issue; if not, the Commissioner's claim for certain periods is probably time-barred.

The Association advances a purely linguistic argument on this point. It notes that the text of the Form provides for an extension of the limitation period solely with respect to tax due on "any return(s) made" by the Association during the periods in question. The only returns so made were information returns, on Form 990, entitled "Return of Organization Exempt from Income Tax." By definition, no tax could possibly be due on an information return. Taking this literal view, the Association contends that the Form did not extend the limitation period at all.

■ The Tax Court refused to swallow this slippery syllogism. It impliedly found the language of the Form ambiguous and construed it as broad enough to include not only taxes due on returns made but also taxes due on returns deemed to be made. *See* Tax Ct.Op. at 589. Ascertaining the ambiguity *vel non* of a writing requires a court to ask and answer a question of law, and, therefore, we review this conclusion de

novo. *See* IRC § 7482(c)(1); *see also RCI Northeast Servs. Div. v. Boston Edison Co.,* 822 F.2d 199, 202 (1st Cir.1987).

The Tax Court's rendition withstands scrutiny. Tax forms are rarely models of syntactical clarity, and the Form signed by the parties is no exception. The Tax Court read the phrase "return(s) made" as encompassing returns deemed to be made. This construction strikes us as reasonable.

Words must be read in context. Though a plain vanilla reading of the Form would support an inference that the parties wished to extend the limitation period for assessing taxes due on actual returns filed for the applicable periods, the context casts a different light on the phrase "return(s) made." When one takes into account that the only "returns made" were information returns on which no tax could conceivably be due, and that the signatories to the Form knew as much, the ambiguity of the phrase becomes apparent.

▮ Our thinking runs along the following lines. It would be nonsensical to extend the limitation period for assessment of taxes due on a return on which, by operation of law, no tax conceivably could be due. The law, in turn, should be reluctant to insist that courts construe a document in a way that leads to an absurd or nonsensical result. Indeed, the maxim *ut res magis valeat quam pereat* teaches that a written instrument ordinarily should be given a meaning that will make it legally functional rather than a meaning which will render it legally dysfunctional. *See* 3 Arthur Linton Corbin, *Corbin on Contracts* § 532 (1960); *see also Blackie v. Maine,* 75 F.3d 716, 722 (1st Cir.1996). Thus, the very implausibility of the Association's proposed construction suggests that the phrase "return[s] made" must have some other meaning.

This conclusion is fortified by the wonted operation of the relevant provisions of the Internal Revenue Code. Specifically, a return relative to the unrelated business taxable income of a normally tax-exempt organization (a so-called "990–T" return) is deemed made, for purposes of starting the running of the limitation period, when the information return (a so-called "990" return) is in fact made. *See California Thoroughbred Breeders Ass'n v. Commissioner,* 47 T.C. 335, 338, 1966. WL 1128 (1966) (construing IRC § 6501(g)(2)). Without this rule deeming the Association's 990 return to be a 990–T return, the statute of limitations that the Association seeks to invoke would, presumably, not yet have begun to run. The Association thus seeks to link the two forms for the purposes of starting the limitations period, but would have us decouple the forms in reviewing its agreement to extend that period. Perhaps more important, reading the Form against the backdrop of the *California Thoroughbred Breeders* rule suggests another (broader) meaning for the phrase "return(s) made"—a meaning which extends to returns deemed made—and thus highlights the ambiguity of the Form.

▮ That ends the matter. The presence of an ambiguity permits a reviewing court to examine extrinsic evidence in an effort to clarify the intent of the parties. *See Smart v. Gillette Co. Long–Term Disability Plan,* 70 F.3d 173, 179 (1st Cir.1995); *RCI Northeast,* 822 F.2d at 202. Here, the extrinsic evidence is telling: the Association's reading of the Form contradicts what even the Association admits was the parties' mutual intention—to extend the limitation period as to any unrelated business income tax that might be due for the affected periods.

We need not linger.[2] We resolve contractual ambiguity in favor of effectiveness, accept the discerned intent of the parties, en-

---

**2.** The court below suggested that, if it were unable to construe the language in the Form to give effect to the parties' discerned intention, it could reach the same result by reforming the instrument. *See* Tax Ct.Op. at 589 n. 4. In general, reformation is available when a writing is clear on its face (i.e., unambiguous) but nonetheless misstates the parties' intent. *See, e.g., United States v. Lumbermens Mut. Cas. Co.,* 917 F.2d

654, 658 (1st Cir.1990); *Rocanville Corp. v. Natural Gas Pipeline Co.,* 823 F.2d 92, 94 (5th Cir. 1987); *see also* Restatement (Second) of Contracts § 155 (1979). The doctrine can be applied in tax cases. *See, e.g., Woods v. Commissioner,* 92 T.C. 776, 782–83, 1989 WL 32907 (1989). However, because we uphold the Tax Court's implicit finding that the Form is ambiguous, we need not reach the reformation issue.

dorse the Tax Court's interpretation of the phrase "return[s] made," and hold that the Form extended the limitation period as to the assessment of unrelated business income tax. The notice of deficiency was, therefore, timely as to all the contested tax years.

## III. THE MERITS

■ The gravamen of the Commissioner's case is the charge that the activity undertaken in connection with publication of *The Constabulary* generated unrelated business taxable income. The allegation that an activity engaged in by a tax-exempt organization gives rise to unrelated business taxable income requires proof of three components. The Commissioner must demonstrate (1) that the activity comprises a trade or business, (2) which is regularly carried on, and (3) which is not substantially related to the organization's tax-exempt purpose. *See United States v. American Bar Endowment,* 477 U.S. 105, 110, 106 S.Ct. 2426, 2429, 91 L.Ed.2d 89 (1986); *see also* IRC § 513(a).

### A.

At the gateway to this issue, the parties dispute the standard of review. The Association asserts that the Tax Court's findings—that publication of *The Constabulary* involved a business regularly carried on [3]—are subject to de novo review. The Commissioner maintains that these findings are entitled to greater deference.

■ Congress has directed the courts of appeals to use the same standards in reviewing Tax Court decisions that traditionally are used in appellate review of district court decisions in civil actions tried without a jury. *See* IRC § 7482(a). Consequently, we evaluate the Tax Court's findings of fact under the clearly erroneous standard. *See Commissioner v. Duberstein,* 363 U.S. 278, 291, 80 S.Ct. 1190, 1200, 4 L.Ed.2d 1218 (1960);

*Manzoli v. Commissioner,* 904 F.2d 101, 103 (1st Cir.1990); *see also* Fed.R.Civ.P. 52(a). This mode of review requires us to accept the Tax Court's credibility determinations and its findings about historical facts unless, after careful evaluation of the evidence, we are left with an abiding conviction that those determinations and findings are simply wrong. *See Reliance Steel Prods. Co. v. National Fire Ins. Co.,* 880 F.2d 575, 576 (1st Cir. 1989). Notwithstanding the clearly erroneous rule, however, the Tax Court's ultimate conclusions (e.g., whether the facts, as found, are legally sufficient to demonstrate that the Association engaged in a trade or business) are conclusions of law, and are therefore subject to de novo review.

On the merits, the Association advances two challenges: it asserts that the activities in question did not constitute a trade or business, and that in all events those activities were not conducted with the requisite regularity. We address these challenges sequentially.

### B.

■ The operating paradigm permitted the Association to exercise significant control over the sales effort, the handling of the funds generated, and the publication of *The Constabulary.* Under this paradigm, the Association contracted with an outside firm (originally Brent–Wyatt East, and later R.H. McKnight Co.) to publish the yearbook and recruit telemarketers. These telemarketers were considered joint employees of the Association and the outside firm.[4] Groups of eight to twelve callers worked out of field offices selected by the outside firm with the Association's approval and solicited local and national businesses within geographic areas demarcated by the Association. In so doing, they utilized a canned solicitation format approved by the Association, introducing them-

---

3. The Association does not mount a challenge on the third prong of the tripartite test, instead conceding that if the activity amounts to a regularly conducted trade or business, it is, as the Tax Court found, not substantially related to the Association's tax-exempt purpose. *See* Tax Ct.Op. at 591.

4. We describe the relationship as it existed through mid–1990, under contractual arrangements with Brent–Wyatt East. Although the contract signed with McKnight on June 20, 1990, contained some variations, the Tax Court supportably found that these changes were largely cosmetic and did not alter the essential character of the relationship. *See* Tax Ct.Op. at 585.

selves as calling on behalf of the Association. Troopers monitored all solicitations to make certain that the sales staff did not trespass into forbidden terrain. The Association also retained the right to inspect, without prior notice, the field offices from which solicitations took place.

Prospective customers were offered the opportunity to purchase display advertisements and listings. Displays ranged in size from one-sixth of a page to a full page, and, at the purchaser's option, could contain text, logos, slogans, borders, and blocking. The fee charged for a display advertisement or a directory listing varied in direct proportion to the size of the display or listing and to the number of editions in which it appeared.[5] *The Constabulary* was arranged so that displays were interspersed with editorial matter, and the publication contained a so-called "Index to Advertisers." Listings were arranged by type of product or service in a separate business directory section.

Payments for ads sold were made to the Association and the Association deposited the receipts in its account. It made weekly accountings—retaining a stipulated percentage "off the top" for itself, paying set percentages of the gross receipts to the telemarketers and to the outside firm, defraying the costs associated with solicitation and publication—and kept any excess.

The Association published *The Constabulary* annually. Association members acted as the editorial staff, writing and editing articles for the publication and approving the contents of the finished product. The Association distributed the yearbook free of charge at various state troopers' barracks, the Association's annual picnic (the "Police Chase"), and other occasions. Copies were sometimes sent to advertisers.

Based on this scenario, the Commissioner's theory is that the Association—which from time to time called *The Constabulary* an "ad book" and which, in its contract with Brent–Wyatt East, referred to the latter's assignment as "marketing advertising"—engaged in the business of selling advertising. The Association counters that it did not engage in

that business; in its view, the displays and listings were not advertising at all, but merely a means of identifying sponsors. The Tax Court rejected this contention, *see* Tax Ct. Op. at 590, and so do we.

Even a cursory glance at the yearbook, the pricing structure, and the terminology used by the Association belies the belated claim that the ads and listings were not "advertising" as that term is commonly understood. Nor is the Association's attempted recharacterization made any more palatable by its reliance on Proposed Treas.Reg. § 1.513–4, 58 Fed.Reg. 5690, 5690 (1993). The proposed regulation describes the permissible contents of acknowledgements of sponsorship payments; it allows value-neutral descriptions of a sponsor's products or services, and logos or slogans "that are an established part of a sponsor's identity." *See id.* § 1.513–4(c). We need not decide, however, whether the materials in *The Constabulary* meet these exacting criteria; the proposed regulation, by its terms, does not apply to periodicals produced by tax-exempt organizations. *See id.* § 1.513–4(a).

Putting the proposed regulation to one side, the Commissioner's appraisal of *The Constabulary's* contents comports with common sense: the displays look like ads, the directory listings function as guides to products and services, and the Association itself, at least during the first four years of the undertaking, consistently referred to the displays and listings as ads rather than as acknowledgements. That appraisal also is supported by well-reasoned precedent.

*Fraternal Order of Police, Etc. v. Commissioner,* 87 T.C. 747, 1986 WL 22030 (1986), *aff'd,* 833 F.2d 717 (7th Cir.1987) (*FOP* ), which also involved the solicitation and sale of insertions in a publication sponsored by a tax-exempt policemen's organization, bears a strong resemblance to the case at bar. The Tax Court found that the activity in question amounted to an unrelated business. 87 T.C. at 757. The Seventh Circuit affirmed this finding. 833 F.2d at 721–22. The similarities are striking. There, as here, the publication included display ads (using logos, slo-

---

**5.** The Association produced five regional editions with common editorial material.

gans, and blocking), a directory section, and a message asking readers to patronize the businesses listed therein. *See id.* at 719–20. There, as here, the size of an insertion was directly proportionate to the price charged. *See id.* at 721. There, as here, the sponsoring organization, prior to the time the Commissioner came calling, characterized the disputed activity as advertising. *See id.*

Given these similarities, *FOP* is powerful authority for the Commissioner's position that the activity here in question comprises a separate, unrelated business. We consider *FOP* correctly decided, and we find unconvincing the Association's attempts to distinguish it.[6] Consequently, we hold that the Tax Court did not commit clear error in finding that the Association's solicitation, sale, and publication of displays and listings in *The Constabulary* constituted the business of advertising.

■ The Association's fallback position is its claim that the Commissioner erred in treating the outside firms (Brent–Wyatt East and McKnight, respectively) as agents of the Association (and, thus, in attributing these firms' activities to the Association). To bolster this claim, the Association stresses that the contract documents required these firms to operate as independent contractors. It follows, the Association says, that even if the cited activities constituted the business of advertising, the business belonged to the outside firms.

■ We are not persuaded. In the first place, an independent contractor can be an agent if, and to the extent that, the contractor acts for the benefit of another and under its control in a particular transaction. *See* Restatement (Second) of Agency §§ 2, 14N (1957). In the second place, the label which contracting parties place on their relationship is not decisive of their status vis-à-vis third parties. *See Board of Trade v. Hammond Elevator Co.,* 198 U.S. 424, 437, 25 S.Ct. 740, 743, 49 L.Ed. 1111 (1905). Either way, answering the question that the Association raises requires that we examine the substance of the contracting parties' relationship.

In this analysis, no single factor is dispositive. *See Labor Relations Div. of Constr. Indus. v. International Bhd. of Teamsters,* 29 F.3d 742, 748 (1st Cir.1994). Rather, the nature of the relationship between the Association and the outside firms depends on a myriad of factors, including control over the manner and means of performing the work, the skill required, the method of payment, the duration of the relationship, and similar factors. *See, e.g., Saenger Org., Inc. v. Nationwide Ins. Licensing Assocs., Inc.,* 119 F.3d 55, 60 (1st Cir.1997); *Speen v. Crown Clothing Corp.,* 102 F.3d 625, 629–30 (1st Cir.1996). The relevant factors here, taken as a whole, solidly support the Tax Court's determination that the outside firms acted as the Association's agents.

First and foremost, the manner in which the Association conducted its affairs undercuts its claim that it lacked the requisite degree of suasion over the outside firms' activities. The Association retained very tight control over the method and manner of solicitation, the ingredients of the sales pitch, the identity of the solicitors, the financial aspects of the arrangement, the use of its name, the advertising formats, and the contents of the yearbook. We refer the reader who hungers for a blow-by-blow account to the details set out in the opinion below. *See* Tax Ct.Op. at 584–85. Without belaboring the point, it is enough to say that the record reveals an ample factual predicate for the finding that an agency relationship existed between the Association and the outside firms.

### C.

■ The Association's final contention is that, even if its activities comprise a business attributable to it, that business was not carried on regularly. To buttress this conten-

---

**6.** In striving to reach escape velocity from *FOP*'s precedential orbit, the Association relies heavily on its presentation of expert testimony at trial. But this testimony was discounted by the Tax Court because the expert was dismally un-informed. *See* Tax Ct.Op. at 589–90. That determination was well within the trier's purview. *See Seagate Tech., Inc. v. Commissioner,* 102 T.C. 149, 186, 1994 WL 34636 (1994).

tion, the Association makes two separate, but related, arguments.

Its first asseveration rests on the decisions in *National Collegiate Athletic Ass'n v. Commissioner*, 914 F.2d 1417 (10th Cir.1990) (*NCAA*), and *Suffolk County Patrolmen's Benevolent Ass'n v. Commissioner*, 77 T.C. 1314, 1981 WL 11314 (1981). These decisions are inapposite. In each instance, the advertising activity was tied to the program for a specific event. *See NCAA*, 914 F.2d at 1420 (collegiate basketball tournament); *Suffolk County*, 77 T.C. at 1316 (vaudeville show). Thus, resolution of those cases depended on Treas.Reg. § 1.513–1(c)(2)(ii), which specifically provides that "publication of advertising in programs for sports events or music or drama performances will not ordinarily be deemed to be the regular carrying on of business." That regulation is of no assistance here because the Tax Court found specially that the Association's publication of *The Constabulary* was not linked to the occurrence of a specific event, *see* Tax Ct.Op. at 593, and the Association has not challenged that finding in this venue.[7]

■ We hasten to add, moreover, that the mode of analysis used in *NCAA* and *Suffolk County* cannot be employed here. Because those cases each involved a particular event, they looked to the time frame of the event in determining the regularity with which the business was carried on. *See NCAA*, 914 F.2d at 1422–23; *Suffolk County*, 77 T.C. at 1322–24. In a case like this one, where the publication of an ad book is not pegged to a particular event, a court must assay the activities which collectively comprise the business, and look to the overall time frame in which they occurred. For present purposes, that means the time frame in which the Association solicited, sold, and published advertising. *See* Treas.Reg. § 1.513–1(b) (noting that the activities of soli-

citing, selling, and publishing advertising collectively constitute a business). Those activities persisted for approximately 46 weeks a year.[8] *See* Tax Ct.Op. at 593. This is more than sufficient regularity by any standard.

The Association next argues that it did not regularly engage in a business because it did not carry on the advertising activity with the same entrepreneurial zeal that might typify a commercial operator. But this is an ill-conceived comparison. Although the purpose behind the unrelated business income tax is to create a more level playing field between taxed and tax-exempt enterprises, competitive similarities are not the only factors to be taken into account. *See FOP*, 833 F.2d at 722–23. The applicable regulation stipulates that the activity in question must be judged "in light of the purpose" of the tax, but it does not require that either actual competition or competitive equality be shown. Treas.Reg. § 1.513–1(c)(1).

In this instance, the Association carried on its activities in a systematic and well-organized fashion, with a clearly defined profit motive. Given the limitations of clear-error review, we cannot disturb the lower court's finding that the Association's activities were sufficiently regular to bring them within the ambit of the regulation. *See* Tax Ct.Op. at 593.

## IV.  CONCLUSION

We need go no further. While the Association makes several other arguments, none requires discussion; each of them is either adequately treated in the Tax Court's opinion, or obviously incorrect, or both. It suffices to say that the Commissioner's determination of the tax due and owing rests on a sturdy factual and legal foundation.

### *Affirmed.*

---

7. It is interesting to note that Proposed Treas. Reg. § 1.513–4 draws a clear distinction between periodicals and material published in connection with a specific sponsored event. We find the distinction significant.

8. To be sure, the Association argues that the time frame is much shorter because, although solicitation and sales transpired 46 weeks a year, publi-

cation occurred within a very narrow temporal window. This argument is disingenuous. Treas. Reg. § 1.513–1(b) refers to the activities of soliciting, selling, and publishing advertising as a singular business. That business must be regularly carried on, but there is no requirement that each task within the scope of the business must be carried on regularly.

APPENDIX

| Form **872**  (Rev. August 1988) | Department of the Treasury—Internal Revenue Service  **Consent to Extend the Time to Assess Tax** | In Reply Refer To:  SSN or EIN  04-2462459 |
|---|---|---|

taxpayer(s) of _____ **State Police Assoc. of Massachusetts** _____
*(Name(s))*
_____ **388 Hillside Ave.  Needham, Ma. 02194** _____
*(Number, Street, City or Town, State, ZIP Code)*

and the District Director of Internal Revenue or Regional Director of Appeals consent and agree to the following:

(1) The amount of any Federal _____ **Income  Excise or** _____ tax due on any return(s) made by
*(Kind of tax)*
or for the above taxpayer(s) for the period(s) ended _____ **April 30, 1986, 1987, 1988, 1989 and**

**July 31, 1989**

may be assessed at any time on or before _____ **April 30, 1993** _____ . However, if
*(Expiration date)*
a notice of deficiency in tax for any such period(s) is sent to the taxpayer(s) on or before that date, then the time for assessing the tax will be further extended by the number of days the assessment was previously prohibited, plus 60 days.

(2) This agreement ends on the earlier of the above expiration date or the assessment date of an increase in the above tax that reflects the final determination of tax and the final administrative appeals consideration. An assessment for one period covered by this agreement will not end this agreement for any other period it covers. Some assessments do not reflect a final determination and appeals consideration and therefore will not terminate the agreement before the expiration date. Examples are assessments of: (a) tax under a partial agreement; (b) tax in jeopardy; (c) tax to correct mathematical or clerical errors; (d) tax reported on amended returns; and (e) advance payments. In addition, unassessed payments, such as amounts treated by the Service as cash bonds and advance payments not assessed by the Service, will not terminate this agreement before the expiration date.

This agreement ends on the above expiration date regardless of any assessment for any period includible in a report to the Joint Committee on Taxation submitted under section 6405 of the Internal Revenue Code.

(3) The taxpayer(s) may file a claim for credit or refund and the Service may credit or refund the tax within 6 months after this agreement ends.