# United States Court of Appeals
## For the First Circuit

No. 18-1637

GARRICK CALANDRO, as Administrator of the Estate of
Genevieve Calandro,

Plaintiff, Appellant,

v.

SEDGWICK CLAIMS MANAGEMENT SERVICES, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Kayatta, Circuit Judge,
Souter,[*] Associate Justice,
and Selya, Circuit Judge.

David J. Hoey, with whom Daniel T. Landry and Law Offices of
David J. Hoey, P.C. were on brief, for appellant.
Allen N. David, with whom Jane A. Horne, Catherine M. Scott,
and Peabody & Arnold LLP were on brief, for appellee.

March 18, 2019

---

[*] Hon. David H. Souter, Associate Justice (Ret.) of the Supreme
Court of the United States, sitting by designation.

**SELYA**, <u>Circuit Judge</u>.    A Massachusetts statute, familiarly known as Chapter 176D, requires firms that are "in the business of insurance" to handle claims in good faith and to respond reasonably to the exigencies of the settlement process. Mass. Gen. Laws ch. 176D, § 3.   But every case has twists and turns, and an insurance carrier is not to be held to a duty of prescience.

This case illustrates the point.   In it, plaintiff-appellant Garrick Calandro, suing in his capacity as administrator of the estate of Genevieve Calandro (his late mother), won a multi-million dollar jury verdict for wrongful death and conscious pain and suffering against a nursing home.   Attempting to add to the spoils of that victory, the plaintiff then sued a claims-management firm, defendant-appellee Sedgwick Claims Management Services, Inc. (Sedgwick), contending that Sedgwick's actions, both pre- and post-verdict, violated Chapter 176D.[1]   That suit was tried to the district court which entered a take-nothing judgment.   The plaintiff appeals, arguing that the district court erred in holding

---

[1] As its corporate name implies, Sedgwick is in the claims-management business.   It is an open question whether a claims-management firm, as opposed to an insurance carrier, is "in the business of insurance," Mass. Gen. Laws ch. 176D, § 3, and therefore subject to the provisions of Chapter 176D.   We need not answer this question today but, rather, follow the district court's lead and assume, without deciding, that Sedgwick is subject to the strictures of Chapter 176D.

that Sedgwick's actions did not constitute unfair claims settlement practices.

Bench trials evoke a deferential standard of review. Applying this respectful standard, we affirm the judgment below.

## I. BACKGROUND

The case at hand involves a tangled web of facts and a complicated procedural history. For ease in exposition, we offer only a barebones sketch and refer the reader who hungers for the full anthology to the district court's opinions. See Calandro v. Sedgwick Claims Mgmt. Servs. (Calandro I), 264 F. Supp. 3d 321 (D. Mass. 2017); Calandro v. Sedgwick Claims Mgmt. Servs. (Calandro II), No. 15-10533, 2017 WL 5593777 (D. Mass. Nov. 21, 2017).

Sedgwick is a claims-management firm, that is, a third-party administrator of insurance claims. At the times material hereto, Hartford Insurance Company (Hartford) insured the Radius Danvers nursing facility (Radius), located in Danvers, Massachusetts. Hartford retained Sedgwick to handle claims arising out of Radius's operations.

During this period, Genevieve Calandro was a resident at Radius. While there, she fell from her wheelchair and was taken to a local hospital. She never returned to Radius and died at a hospice facility on August 16, 2008.

After securing letters of administration, the plaintiff sued Radius in a Massachusetts state court. His complaint

- 3 -

adumbrated claims for negligence and wrongful death. Sedgwick learned of the suit on October 12, 2011. On the same day, it received a letter from the plaintiff's attorney demanding $500,000 to settle the plaintiff's claims. According to Sedgwick, no information that might have facilitated settlement was received along with the demand letter.

Sedgwick engaged Attorney Lawrence Kenney as Radius's defense counsel. It also engaged an independent adjuster, Paul Bistany, and instructed him to "assess the liability and injuries for possible resolution." Bistany's first report, dated October 24, 2011, noted that the cause of death seemed to be related to ongoing medical conditions and, thus, did not necessarily evince any negligence on Radius's part. In the same report, Bistany noted that some of the documents that he expected to find (such as the incident report following the fall) were missing from Radius's files. Finally, Bistany explained that he had experienced difficulty in locating witnesses (apparently because Radius's parent company was in the process of closing the facility).

Bistany furnished a second report to Sedgwick in January of 2012. This report recounted, inter alia, his success in locating and interviewing two nurses who had cared for Genevieve Calandro. Their information proved unhelpful, though, as they offered inconsistent recollections of what transpired before and after Genevieve fell from her wheelchair. In July of 2012, the

plaintiff added Dr. David Wahl, who was both Radius's medical director and Genevieve's attending physician, as a defendant in the state-court suit.

We fast-forward to May 1, 2013. On that date, a hearing was held before a medical malpractice tribunal (MMT). See Mass. Gen. Laws ch. 231, § 60B. During the MMT proceeding, the plaintiff tendered an offer of proof, which included Genevieve's death certificate and some form of opinion evidence from a retained expert, Dr. Paul Genecin. The record of the MMT proceeding is not in evidence, and the parties dispute what quantum of information Sedgwick received at that time. Sedgwick maintains that the plaintiff's offer of proof was simply an outline of Dr. Genecin's opinion and, as such, was insufficient to make liability reasonably clear. It adds that it did not receive Dr. Genecin's full report until April 27, 2014. The plaintiff disagrees: he asserts — based on his interpretation of a note handwritten by Mary Blair (the Sedgwick official in charge of the case) — that Sedgwick was given Dr. Genecin's full report in anticipation of the MMT proceeding (May of 2013) and that, therefore, the MMT proceeding yielded information that established Radius's liability for the death of Genevieve Calandro.

The MMT allowed the state-court suit to proceed, see Mass. Gen. Laws ch. 231, § 60B, and discovery continued. During Dr. Wahl's deposition, taken on November 13, 2013, the plaintiff

- 5 -

offered to settle all claims against Radius and Dr. Wahl for $500,000. The defendants responded on February 6, 2014, extending a joint settlement offer of $275,000. Of this amount, Radius was to contribute $125,000. Around the same time (February 7, 2014), Attorney Kenney wrote a report to Sedgwick, in which he forecast the defendants' exposure at verdict to be in the $300,000 to $500,000 range.

The plaintiff rejected the defendants' February 6 counter-offer, but the parties persisted in their efforts to settle the state-court suit. Nevertheless, the gap grew wider when, in April of 2014, the plaintiff increased his demand to $1,000,000. The next month, the defendants put a joint counter-offer of $300,000 on the table. In a letter dated June 4, 2014, Attorney David Hoey, representing the plaintiff, rejected this counter-offer and began efforts to get separate offers from each of the defendants.

In mid-June of 2014, Blair called Attorney Hoey and voiced her desire to settle the matter. Before Blair got around to proposing a settlement amount, Attorney Hoey ended the call, saying that he needed to speak with his client. Blair heard back, albeit indirectly, when Attorney Hoey emailed Attorney Kenney on June 17, that the case could not be resolved in the range of the last previous offer. Dr. Wahl's counsel found a more receptive audience: he settled the plaintiff's claims against his client

for $250,000 — a settlement in which the plaintiff reserved all rights against Radius. Neither Sedgwick nor Attorney Kenney was privy to these negotiations.

On July 3, 2014, one of Attorney Hoey's associates e-mailed Attorney Kenney, informed him of the separate settlement with Dr. Wahl, and demanded $1,000,000 to settle the plaintiff's claims against Radius. The e-mail indicated that unless an offer exceeding $500,000 was extended by July 9, settlement negotiations would be terminated and the case would proceed to trial. Due to the July 4 holiday, Attorney Kenney did not see the e-mail until July 8. No counter-offer was made within the stipulated time frame. On July 14, though, Attorney Kenney offered the plaintiff $250,000 and communicated his belief that there was some room to negotiate. Attorney Hoey turned down the offer and eschewed further negotiations.

The state-court trial commenced on July 17, 2014, lasting for four days. Radius admitted to breaching the standard of care and tried the case on the issues of causation and damages. The jury found Radius grossly negligent and held it liable both for Genevieve Calandro's wrongful death and for her conscious pain and suffering, awarded the plaintiff $1,425,000 in compensatory damages, and also awarded him $12,514,605 in punitive damages.

Hartford's policy limit — $1,000,000 — was inadequate to satisfy the verdict. Not surprisingly, Attorney Hoey notified

both Hartford and Sedgwick that the plaintiff planned to seek damages under Chapter 176D and Chapter 93A. In response, Sedgwick offered just under $2,000,000 to settle the claims against it, but the plaintiff spurned that offer. Thereafter, Hartford began negotiating separately and made its peace with the plaintiff. The details of that arrangement need not concern us.

In due course, the plaintiff sued Sedgwick in a Massachusetts state court. Citing diversity of citizenship[2] and the existence of a controversy in the requisite amount, Sedgwick removed the action to the federal district court. See 28 U.S.C. §§ 1332(a), 1441(b). Once a litany of pretrial issues were resolved, see, e.g., Calandro I, 264 F. Supp. 3d at 325, the district court convened a bench trial. Following the taking of testimony, post-trial briefing, and arguments of counsel, the court ruled in Sedgwick's favor. It concluded that "reasonable offers" were made "at key points leading up to trial" in the state court, and that the plaintiff had rejected all of those offers. Calandro II, 2017 WL 5593777, at *5. Moreover, "causation and damages were hotly contested" throughout the proceedings, at least with respect to the wrongful death claim. Id. Viewed in context,

---

[2] The plaintiff is a citizen of Massachusetts, as was Genevieve Calandro at the time of her death. Sedgwick is an Illinois corporation, which maintains its principal place of business in Tennessee.

- 8 -

Sedgwick's conduct did not transgress Chapter 176D. See id. at *8. This timely appeal ensued.

## II. ANALYSIS

Following a bench trial, we review the district court's legal determinations de novo. See Smith v. F.W. Morse & Co., 76 F.3d 413, 420 (1st Cir. 1996). In contrast, we accept the court's factual findings, including reasonable inferences drawn from raw facts, unless those findings are clearly erroneous. See United States v. U.S. Gypsum Co., 333 U.S. 364, 394-95 (1948); Smith, 76 F.3d at 420. Put another way, the district court's findings of fact must be honored unless, "after careful evaluation of the evidence, we are left with an abiding conviction that those determinations and findings are simply wrong." State Police Ass'n of Mass. v. Comm'r of Internal Revenue, 125 F.3d 1, 5 (1st Cir. 1997); see Fed. R. Civ. P. 52(a). Where, as here, an appellate court is called upon to review findings of fact made at a bench trial, this deference makes perfect sense: in such a situation, the trial court "sees and hears the witnesses at first hand and comes to appreciate the nuances of the litigation in a way which appellate courts cannot hope to replicate." Cumpiano v. Banco Santander P.R., 902 F.2d 148, 152 (1st Cir. 1990); Reliance Steel Prods. Co. v. Nat'l Fire Ins. Co. of Hartford, 880 F.2d 575, 576 (1st Cir. 1989) (observing that "[d]isputes of this nature are the

staples of a trial court's diet, and comprise an unappetizing, usually unnourishing, bill of fare for appellate digestion").

In this diversity case, the substantive law of Massachusetts controls. See Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938). Under Massachusetts law, a firm that is in the business of insurance commits an "[u]nfair claim settlement practice[]" by "[f]ailing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear," Mass. Gen. Laws ch. 176D, § 3(9)(f), or by "[r]efusing to pay claims without conducting a reasonable investigation," id. § 3(9)(d). A party whose rights are abridged by a violation of Chapter 176D is "entitled to bring an action to recover for the violation under [Mass. Gen. Laws Chapter 93A section 9]." Rhodes v. AIG Domestic Claims, Inc., 961 N.E.2d 1067, 1075 (Mass. 2012); see McDermott v. Marcus, Errico, Emmer & Brooks, P.C., 775 F.3d 109, 117 (1st Cir. 2014). "Together, the[se] statutes require an insurer . . . 'promptly to put a fair and reasonable offer on the table when liability and damages become clear . . . .'" Bobick v. U.S. Fid. & Guar. Co., 790 N.E.2d 653, 658 (Mass. 2003). It bears emphasis, however, that the duty to settle arises only when liability and damages for the underlying claim have become reasonably clear. See id. at 659; Clegg v. Butler, 676 N.E.2d 1134, 1140 (Mass. 1997). Liability is not reasonably clear if an element in the underlying claim is subject to good-faith disagreement. See Clegg,

676 N.E.2d at 1138.  An insurer who has investigated a claim and has a good-faith basis for concluding that liability is not reasonably clear does not violate Chapter 176D either by delaying a settlement offer or for withholding one altogether.[3]  See id. at 1140.

With this framework in place, we turn to the district court's conclusion that Sedgwick did not violate Chapter 176D. This conclusion rests on a foundation of subsidiary findings:  that Sedgwick investigated the claim in a timeous manner and in good faith by, among other things, engaging Bistany and retaining Attorney Kenney, requiring serial reports, and hiring a medical expert; that, based (at least in part) on this investigation, the causation element of the wrongful death claim was not reasonably clear and, thus, Sedgwick had adequate reason to contest liability thereon; and that, even assuming that liability was reasonably clear with respect to the claim for conscious pain and suffering, Sedgwick did not violate Chapter 176D because it made reasonable settlement offers at appropriate times.  See Calandro II, 2017 WL 5593777, at *7.

---

[3] To be sure, an insurer cannot avoid liability under Chapter 176D by playing the ostrich and burying its head in the sand.  The insurer's investigation must itself be carried out expeditiously and in good faith, see Clegg, 676 N.E.2d at 1140, thus ensuring a degree of accountability.

In this venue, the plaintiff comes out swinging. Hoping to land a knockout blow, he pummels many of the district court's conclusions. For one thing, he submits that liability was reasonably clear as to both the conscious pain and suffering and wrongful death claims in October of 2011 (when Sedgwick received Bistany's initial report). For another thing, he challenges the district court's finding that causation was always a contested issue with respect to the wrongful death claim. Finally, he challenges Sedgwick's good faith and says, among other things, that the district court erred in deeming Sedgwick's settlement offers reasonable and prompt.

The plaintiff is punching above his weight. Most of his arguments can be bundled together and dealt with as a single strike. The common denominator is that those arguments are ineluctably factbound and, taken in the ensemble, boil down to a plaint that the district court missed the mark in concluding that Sedgwick's conduct did not violate Chapter 176D. While the plaintiff acknowledges that these arguments are "factually-intensive" and subject only to clear-error review, he nonetheless invites us to hold that the record as a whole belies the district court's findings. We decline the invitation.

We start with the plaintiff's asseveration that liability was reasonably clear on both the wrongful death and the conscious pain and suffering claims as early as October of 2011.

- 12 -

This asseveration, though, was not articulated in the district court and, thus, may well be waived. See Teamsters Union, Local No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992) ("If any principle is settled in this circuit, it is that, absent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal.").

In all events, the asseveration lacks force. When he conducted his investigation in October of 2011, Bistany was unable to determine whether or to what extent Radius was liable for the death of Genevieve Calandro, partially because certain documents were missing and some witnesses had not yet been located. Based on the incomplete information available to him, Bistany suggested that Genevieve's longstanding health issues seemed to be the most likely cause of the difficulties that she experienced. Given his report of October 24, 2011, Sedgwick had every reason to continue to investigate — as it did — rather than roll over and concede that Radius's negligence was the cause of death. Consequently, we discern no clear error in the district court's implicit finding that, with respect to wrongful death, causation (and, therefore, liability) was not reasonably clear in October of 2011.

The district court's finding that causation (and, therefore, liability) was never reasonably clear with respect to the wrongful death claim at any time before the state-court jury

returned its verdict, see Calandro II, 2017 WL 5593777, at *7, is likewise supportable. In assailing this finding, the plaintiff points to e-mail exchanges between Blair and Attorney Kenney, which he interprets as indicating that liability is likely. Although this argument has a patina of plausibility, it cannot withstand scrutiny.

In the course of the bench trial, witnesses clarified that "liability," as used by lawyers and claims personnel in the insurance industry, typically refers to a breach of the standard of care — not to causation. Both Blair and Attorney Kenney testified that they used the term in that way. The district court credited this account. See id. at *5 n.7. Within wide limits, credibility determinations are committed to the sound judgment of the trial court, see Fed. Refin. Co. v. Klock, 352 F.3d 16, 29 (1st Cir. 2003), and the plaintiff has given us no reason to deviate from that principle here.

We add, moreover, that other evidence amply supported the district court's finding that Sedgwick continually — and in good faith — contested the causation element of the wrongful death claim. See Calandro II, 2017 WL 5593777, at *7. As we have already noted, Bistany reported to Sedgwick, early on, that the cause of Genevieve Calandro's death was unclear. Contrary to the plaintiff's importunings, this uncertainty was not dissipated by the plaintiff's May 2013 offer of proof to the MMT. The district

- 14 -

court supportably found that offer of proof to be no more than an outline of the expert opinion evidence that the plaintiff hoped to adduce at trial and, thus, too insubstantial to render causation (and, therefore, liability) reasonably clear.[4]  See id. at *7-8 & n.9.  In this connection, the district court credited Attorney Kenney's testimony that Sedgwick did not receive Dr. Genecin's complete report (laying out his reasoning about the cause of Genevieve Calandro's death) until late April of 2014.  See id. at *7 n.9.  Blair's handwritten note does not undermine these findings; the plaintiff himself recognized that whatever Blair received served only to make Sedgwick generally "aware of the nature of Dr. Genecin's expected testimony."

In the interval between the MMT proceeding and the disclosure of the expert's complete report, the investigation into liability continued.  It was not until May of 2014 that Sedgwick received an opinion on causation from its own medical expert — an opinion that differed materially from that of Dr. Genecin.  To cinch the matter, the verdict form in the underlying state-court

---

[4] The fact that the MMT allowed the plaintiff's state-court suit to proceed, without more, does not establish that liability on the wrongful death claim was reasonably clear.  See Mass. Gen. Laws ch. 231, § 60B (stating that purpose of MMT is to distinguish claims that are "merely [] unfortunate medical result[s]" from claims that are judicially cognizable); Joseph v. Sweet, 125 F. Supp. 2d 573, 575 (D. Mass. 2000) ("Essentially, [the MMT] is an initial screen, derailing claims with no legal merit from clogging already congested civil court dockets and increasing litigation costs.")

trial revealed that the question of causation was submitted to the jury, thus confirming that Sedgwick never conceded the causation element of the wrongful death claim.

To be sure, the evidence admittedly points in conflicting directions. What matters, however, is that the record as a whole plausibly supports the district court's findings. See Fed. Refin., 352 F.3d at 29 (explaining that when there are "two permissible views of the evidence . . . the factfinder's choice between those competing views cannot be clearly erroneous"). Bistany's reports, intra-company correspondence,[5] the state court's submission of the issue of causation to the jury in the suit against Radius, and testimony given at the bench trial combine to lend strength to the district court's findings. Reasonableness is a construct that depends on the totality of the circumstances in a given case, not an absolute. Cf. United States v. Rudíaz, 529 F.3d 25, 29 (1st Cir. 2008) (concluding, with regard to criminal sentencing context that [r]easonableness "is a construct that must be judged according to objective criteria"). On this record, it was for the trier to determine whether Sedgwick acted reasonably in continuing to argue that Radius's breach of the

---

[5] For example, Blair e-mailed her supervisor roughly one week before the start of the state-court trial, reporting that in light of the comorbidity issues that commonly pertain to elderly and infirm persons like Genevieve Calandro, "we have a strong argument for causation."

standard of care did not cause Genevieve Calandro's demise.  The district court embraced this responsibility, and all of its findings on this topic pass muster under clear-error review.  Taken together, they confirm that the offer of proof did not suffice to close the "causation" gap and that liability on the wrongful death claim was not reasonably clear at any time before the state-court trial.

The case law cited by the plaintiff does not demand a different result.  Without exception, those cases are cases in which liability was reasonably clear from the inception.  See, e.g., Rhodes, 961 N.E.2d at 1071; Gore v. Arbella Mut. Ins. Co., 932 N.E.2d 837, 841 (Mass. 2010).  They are, therefore, readily distinguishable.

To the extent that the plaintiff suggests that Sedgwick acted in bad faith in contesting causation on wrongful death, he is fishing in an empty stream.  The plaintiff premises this suggestion in large part on Sedgwick's withholding of the identities of the two nurses interviewed by Bistany.  However, the plaintiff sought discovery of the nurses' identities in the state court, which refused to compel discovery on the ground that the plaintiff's request was untimely.[6]  Given this ruling, the district

---

[6] At any rate, the nurses were not critical witnesses.  For aught that appears, they were able to offer only vague and inconsistent recollections of the wheelchair incident.  There is no reason to believe that any information Bistany received from

- 17 -

court did not clearly err in finding that, although Sedgwick may have been uncooperative, its decision not to furnish the names was within the bounds of permissible trial strategy and, thus, not a suitable predicate for a finding of bad faith. See Calandro II, 2017 WL 5593777, at *7. A party who chooses to hold its litigation adversary to the rules of discovery can scarcely be said to be exercising bad faith by doing so. Cf. Mulero-Abreu v. P.R. Police Dep't, 675 F.3d 88, 91-93 (1st Cir. 2012) (upholding district court's dismissal of action for failure to follow court-ordered discovery deadlines).

Of course, Sedgwick concedes that liability was reasonably clear with respect to the plaintiff's claim for conscious pain and suffering. As to this claim, the district court found that Sedgwick comported with its duty under Chapter 176D by conducting a good-faith investigation and by making reasonable and prompt settlement offers. See Calandro II, 2017 WL 5593777, at *7.

This is not to say that the district court found Sedgwick's performance to be a textbook model. The court was troubled by some deficiencies in Sedgwick's investigation, but it found those deficiencies to be due in large part to the winding-up of Radius. In the end, the court concluded that Sedgwick did

the nurses' interviews would have served to make causation reasonably clear.

- 18 -

what it could, given the circumstances. See id. at *2. Perfection is not the standard that Chapter 176D imposes upon the handling of a claim. Here, the court supportably found that Sedgwick, on balance, investigated the claims in a manner sufficient to satisfy the strictures of the statute. See Van Dyke v. St. Paul Fire & Marine Ins. Co., 448 N.E.2d 357, 361-62 (Mass. 1983) (concluding that receiving independent advice from expert witness and trial counsel was sufficient even when specifics of actual investigation were unknown). The fact that a qualified investigator was retained almost immediately buttressed this finding. See Clegg, 676 N.E.2d at 1137 (finding investigation reasonable when, among other things, investigator was hired promptly).

This brings us to the plaintiff's complaint that the district court erred in finding that Sedgwick's settlement offers were reasonable and prompt. See Calandro II, 2017 WL 5593777, at *1. Although the district court did not identify a precise date on which liability became reasonably clear with respect to the claim for conscious pain and suffering, it indicated during the bench trial that liability had become reasonably clear on that claim by February of 2014. Thus, in evaluating the reasonableness and promptness of Sedgwick's settlement offers, the court focused on "the value of the case" as of that time.

This time line comports with the reality of events. Discovery in the state-court suit was ongoing during 2013 and, in

November of that year, Dr. Wahl's deposition was taken. It was at that time that Attorney Hoey again renewed his demand (originally made at the time he filed suit and reiterated on October 12, 2011) for a $500,000 settlement. Between December 17, 2013, and January 30, 2014, e-mail exchanges show that Radius and Dr. Wahl were actively considering a joint settlement offer of $300,000. There was some lag time due to a death in Blair's family and, on February 6, the two defendants extended a joint settlement offer of $275,000 for all claims. Even so, they indicated that they had "some room to move." The district court found that this offer, though flatly rejected by the plaintiff, was both prompt and reasonable. See id. at *7.

This finding was not clearly erroneous. In this context, promptness and reasonableness are judgment calls: offers made at divers points during a period of time may be deemed prompt, and a range of amounts may be deemed reasonable. See, e.g., Bohn v. Vt. Mut. Ins. Co., 922 F. Supp. 2d 138, 147-48 (D. Mass. 2013). Especially given the course of discovery, the court below did not clearly err in deeming the offer prompt. See, e.g., id. And especially given the difficulties inherent in placing a dollar value on intangibles such as pain and suffering, the court did not

clearly err in deeming the amount of the offer to be within the universe of reasonable offers.[7]

In addition, the district court found that Sedgwick (acting on behalf of Radius) had made other prompt and reasonable settlement offers that encompassed the claim for conscious pain and suffering. These included its participation in a second joint settlement offer — in the amount of $300,000 — made in May of 2014; its spurned attempt to re-ignite negotiations and make a further offer in June of 2014; and — after Dr. Wahl had settled separately — its $250,000 offer on behalf of Radius alone (made on July 14, 2014). As trial loomed, Attorney Hoey advised Attorney Kenney on July 15, 2014, that the plaintiff was unwilling to resolve the case in the range of Radius's last offer. In the district court's view, these pre-verdict offers were sufficient to inoculate Sedgwick against Chapter 176D liability. See Calandro II, 2017 WL 5593777, at *7. We discern no clear error.

The short of it is that the district court was confronted with a welter of evidence — evidence that lent itself to differing interpretations. In such circumstances, the applicable standard of review requires that we defer to the district court's "fact-

---

[7] In this instance, the finding of reasonableness was bolstered by a trial report that Attorney Kenney submitted to Sedgwick the next day. In it, he estimated the verdict potential for the wrongful death and conscious pain and suffering claims, as an aggregate, to be between $300,000 and $500,000 (which presumably would be split between the two defendants).

intensive findings, absent clear error." Reliance Steel, 880 F.2d at 576 (quoting Irons v. FBI, 811 F.2d 681, 684 (1st Cir. 1987)). We conclude that clear error is clearly absent and that deference to the district court's findings is manifestly appropriate.[8]

This conclusion does not end our odyssey. The plaintiff makes two further arguments, which he characterizes as matters of law, evoking de novo review. It remains for us to deal with those arguments.

To begin, the plaintiff submits that the district court imposed an additional (and improper) burden on him with respect to his derivative rights under Chapter 93A section 9. Specifically, he contends that the district court erred in requiring him to prove that some unfair or deceptive act on Sedgwick's part caused him to suffer a loss. In support, he points to the district court's statement, in its conclusions of law, that the plaintiff "has not shown that Sedgwick's actions constitute an unfair practice." Calandro II, 2017 WL 5593777, at *7.

---

[8] The district court also found that Sedgwick's post-verdict conduct did not violate Chapter 176D. See Calandro II, 2017 WL 5593777, at *8. On appeal, the plaintiff denigrates this finding, but he makes no developed argument that the court below committed clear error in this respect. Consequently, we deem any such argument waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (explaining that "issues averted to in a perfunctory manner unaccompanied by some effort at developed argumentation, are deemed waived").

- 22 -

Whatever the district court may have meant by its conclusion that Sedgwick had not committed an "unfair practice," it plainly did not make any adjudication of the plaintiff's rights under Chapter 93A section 9. "Everything depends on context," Rivera-Velázquez v. Hartford Steam Boiler Inspection & Ins. Co., 750 F.3d 1, 5 (1st Cir. 2014), and the context in which this phrase appears in the district court's rescript undermines the plaintiff's contention. We explain briefly.

The plaintiff's complaint sets out causes of action under Chapter 176D alone. Under the claims as pleaded, Chapter 93A section 9 comes into play only derivatively, that is, as a remedial vehicle for a Chapter 176D violation. Cf. McDermott, 775 F.3d at 117 (noting that "Massachusetts courts have recognized" that a violation of Chapter 176D "automatically give[s] rise to liability under Chapter 93A"). The district court, therefore, was never tasked to make an independent adjudication of a Chapter 93A claim: relief under Chapter 93A section 9 was material only if — and to the extent that — a violation of Chapter 176D was found.

Here, the district court supportably concluded that there was no Chapter 176D violation. See Calandro II, 2017 WL 5593777, at *7. In the absence of an antecedent finding that a Chapter 176D violation had transpired, no derivative liability could exist under Chapter 93A section 9. See McDermott, 775 F.3d at 117. Since the district court never reached the issue of the

- 23 -

plaintiff's right to recover through the medium of Chapter 93A section 9, it necessarily follows that the court's use of the phrase "unfair practice" cannot conceivably signal the imposition of an improper burden.

The plaintiff's remaining argument is no more persuasive. He insists that the district court erred as a matter of law by assessing whether liability was reasonably clear according to a subjective standard rather than an objective standard. The premise on which this argument rests is sound: under Chapter 176D, the question of whether liability is reasonably clear such that an insurer would be bound to make a reasonable settlement offer is an objective inquiry. See Demeo v. State Farm Mut. Auto. Ins. Co., 649 N.E.2d 803, 804 (Mass. App. Ct. 1995). In such an inquiry, liability is reasonably clear if the factfinder determines that "a reasonable person, with knowledge of the relevant facts and law, would probably have concluded, for good reason, that the insurer was liable to the plaintiff." Id.

Here, however, the conclusion that the plaintiff would have us draw is not borne out by the record. Although the district court did not say in haec verba that it was employing an objective standard, actions sometimes speak louder than words. This is such a case.

The record makes manifest that the district court consulted objective evidence and assessed the clarity of Radius's

liability under the appropriate standard. In finding that liability was not reasonably clear on the wrongful death claim, the court relied on investigation reports, status reports, credible testimony from Attorney Kenney about Radius's liability, and the state court's verdict form. Fairly read, the court's finding makes it plain that the court was employing an objective standard.

We need go no further.[9] Inasmuch as the plaintiff has not shown that the district court either misapplied applicable law or clearly erred in finding the facts, his appeal fails.

**Affirmed.**

---

[9] Because we discern neither clear error in the district court's factual findings nor any error of law, we need not consider Sedgwick's alternative defense under the "safe harbor" provision of Chapter 93A section 9. See Calandro I, 264 F. Supp. 3d at 323 (discussing this provision's limiting effect on recovery amount).