# United States Court of Appeals
## For the First Circuit

No. 19-1913

PARAFLON INVESTMENTS, LTD.,

Plaintiff, Appellant,

v.

FULLBRIDGE, INC., ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Kayatta, Circuit Judge,
Souter,[*] Associate Justice,
and Selya, Circuit Judge.

Nicholas D. Stellakis, with whom Michael R. Perry, Anna Baitchenko, and Hunton Andrews Kurth LLP were on brief, for appellant.

Lawrence G. Green, with whom Susan E. Stenger, Kelly K. Ballentine, and Burns & Levinson LLP were on brief, for appellees.

---

[*] Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

May 26, 2020

**SELYA**, **Circuit Judge**. When a seemingly delicious investment opportunity turned rancid and left a foul taste, plaintiff-appellant Paraflon Investments, Ltd. (Paraflon) went on the offensive: it sued the once and former object of its affections, Fullbridge, Inc. (Fullbridge), and Fullbridge's principals, Peter Olson and Candice Olson, claiming fraud and misrepresentation. Following a five-day bench trial, the district court turned Paraflon away empty-handed. See Paraflon Invs., Ltd. v. Fullbridge, Inc., No. 16-12436, 2019 WL 3759522, at *12 (D. Mass. Aug. 9, 2019). Paraflon now seeks appellate review. After rounding off some ragged edges, we affirm.

## I. BACKGROUND

We rehearse the relevant facts consistent with the district court's supportable factual findings. See Dudley v. Hannaford Bros., 333 F.3d 299, 301 (1st Cir. 2003). Our tale begins with an introduction to the protagonists and other leading players.

Paraflon is a private limited company, principally based in the British Virgin Islands and wholly owned by a family trust. The trust's main beneficiary, Michael Sarkesian, scouts investment opportunities for Paraflon. Founded in 2010 by the Olsons and based in Massachusetts, Fullbridge develops training courses for students to facilitate their successful transition into the

workforce.[1]  The Olsons served jointly as Fullbridge's chief executive officers until August of 2015.  Thereafter, Peter Olson alone acted in that capacity.  He resigned in May of 2016.

This case has its genesis in Fullbridge's relationship with Takamol, a subsidiary of the Kingdom of Saudi Arabia's Ministry of Labor.  The Ministry created Takamol with a view toward bolstering the Saudi labor market through private sector partnerships.  In May of 2014, Takamol issued a Request for Proposal (RFP) seeking bidders for "Wave 1" of a project involving the production of online training courses.  Fullbridge submitted a bid and was subsequently notified by Takamol, both verbally and (at some point) in writing, that it was the winning bidder.

In August of 2014 (after Fullbridge had been selected as the winning bidder for Wave 1), Takamol and Fullbridge executed a project agreement, sometimes referred to as the "Master Agreement."  This Agreement provided that it would "serve as a framework for the terms" governing Fullbridge's work, which would occur incrementally in line with discrete work orders.  Each work order would function "as a separate contract and [would] adopt the terms of" the Master Agreement.  In turn, the Master Agreement disclaimed any commitment "that a Work Order will be offered,

---

[1] Where the context admits, we use either the shorthand "Fullbridge" or the term "the defendants" to refer to Fullbridge and the Olsons, collectively.

awarded or entered into," and declared that no "binding agreement" would exist "until the relevant Work Order is formally executed."

In the fall of 2014, Takamol issued a second RFP for "Wave 2" of the project. Fullbridge again submitted a bid and was awarded a portion of the Wave 2 project. After Fullbridge was notified of the award, the parties spent weeks negotiating final pricing, eventually reaching an accord through an exchange of e-mails.

Although the Master Agreement referenced the Wave 1 RFP, its application was not expressly confined to Wave 1. And at the time the Master Agreement was executed, Takamol informed Peter Olson that it would cover all of Fullbridge's future work for Takamol, including any projects associated with Waves 2 and 3. Consistent with this representation, work orders subsequently issued to Fullbridge for both Wave 1 and Wave 2 incorporated by reference the terms of the Master Agreement.

Throughout Fullbridge's work on Waves 1 and 2, Takamol maintained a practice of "perform[] now, paper[] later." Relying on this practice, Fullbridge began work on Wave 1 before the Master Agreement had been executed, proceeding on the basis of verbal assurances from Takamol that it had received the Wave 1 award. Similarly, Fullbridge began multiple projects months before any work orders for those projects were executed.

As Fullbridge's relationship with Takamol matured, Fullbridge found itself undercapitalized and went hunting for investors. In the spring of 2015, Paraflon paid $500,000 to purchase shares of Fullbridge's convertible preferred stock during the company's Series D financing round. At that time, Paraflon had made only a handful of other investments (none of which had been in the education sector).

In April — from this point forward all dates are in 2015 unless otherwise expressly denominated — Takamol issued a third RFP seeking course developers for Wave 3. This RFP included provisions requiring successful bidders to enter into three-year "Framework Agreements" with Takamol. It also required all bidders, "including those who ha[d] previously entered into an agreement with Takamol," to complete a "Legal Requirements attachment" since the standard terms employed in previous RFPs had been updated. Any successful bidder would be "expected to enter into a Framework Agreement with Takamol on the basis" of these legal requirements. Additionally, the RFP stated that "Preferred Bidder[s]" would be notified of that status in writing.

Fullbridge submitted a bid for Wave 3 in late May. In August, Takamol requested a meeting with a Fullbridge decisionmaker to commence negotiations regarding Wave 3. On August 17, three Takamol representatives met with two Fullbridge representatives in Saudi Arabia, with Peter Olson and two other

Fullbridge employees participating by telephone. At this meeting, a Takamol representative stated that Fullbridge had won a substantial share of the Wave 3 project, to include the development of approximately 8,000 learning hours over the course of three years, with the price per learning hour capped at $4,800.[2] Fullbridge estimated that, under this arrangement, it would earn approximately $40 million in revenue.

In the aftermath of the August 17 meeting, Fullbridge understood that the parties had reached a high-level agreement on the approximate number of learning hours, the maximum price per learning hour, and the overall duration of the work. Fullbridge also understood, though, that the parties still needed to negotiate a "second layer" of more granular details. These details included the "families" of course topics that Fullbridge would produce, the number of courses to be developed within each family, and the exact price associated with each family. But based on previous statements that the Master Agreement would govern all of Fullbridge's work for Takamol, Fullbridge did not believe that it would be required to execute a new Framework Agreement for Wave 3.

Shortly after the August 17 meeting, a Fullbridge employee e-mailed Takamol a "pricing offer" containing a proposed

---

[2] At trial, Paraflon objected on hearsay grounds to the admission of testimony about Takamol's statements at the August 17 meeting. The district court overruled this objection. On appeal, Paraflon does not argue that this evidence was improperly admitted.

breakdown of course families, the price per learning hour associated with each family, and the average course length per family. The next day, Abeer AlHashimi (a Fullbridge representative based in Saudi Arabia) reported that Takamol's "initial feedback" on Fullbridge's proposed pricing had been positive and that Fullbridge should expect to hear back from Takamol within two days "on the exact volume and families awarded."

Fullbridge quickly commenced logistical planning for its work on Wave 3, remaining in regular contact with Takamol along the way. Starting in September, Peter Olson checked weekly with AlHashimi, inquiring whether it would be accurate to tell investors that Fullbridge's Wave 3 "deal" was "still on." AlHashimi (who had contact with Takamol's upper echelon) repeatedly confirmed the deal's continued viability. Apparently still strapped for capital, Fullbridge sought loans from two venture capital firms. Both firms requested documentation of the Wave 3 award, sparking a series of communications between Fullbridge and Takamol about Wave 3's status. Although we need not recite book and verse, several data points bear mention.

To begin, Takamol declined to sign a non-binding statement, drafted by Fullbridge, confirming the Wave 3 award. Then — in an e-mail to Takamol in late October — Peter Olson indicated that Fullbridge was ready to begin work in earnest on Wave 3 "pending the actual award of courses and a clear timetable

for delivery."[3]  He requested "a sense of the exact timing and courses designated."  Takamol responded that although it had been "delayed by issues outside of [its] control," matters seemed to be "moving in the right direction."  Emphasizing that it valued its "partnership" with Fullbridge, Takamol stated that although it could not give "a date now," all partners could expect to receive "a better outlook" the following week.

In an e-mail to AlHashimi a few days later, Takamol indicated that it was "still waiting for the management approval in this particular RFP" and proposed that an alternative arrangement be implemented "to expedite the approval."  This alternative arrangement entailed the issuance of a so-called buffer order for "a certain number of learning [h]ours" on a "letter of intent basis" and a fixed price agreement that would set the "price and the demand for [the] long period agreement." Takamol's representative noted that although he did not know "how much" would ultimately be agreed to (an apparent reference to the volume and/or price of courses), Fullbridge's original pricing offer was "acceptable" to him.  AlHashimi responded that Fullbridge would accept this arrangement if Takamol confirmed the full scope

---

[3]  In this e-mail, Peter Olson described Fullbridge as "delighted to have been shortlisted as a course developer" for Wave 3.  He testified at trial that by "shortlisted," he meant that Fullbridge was "honored to be part of a very short list" of successful bidders.

of the Wave 3 project (specifically, a minimum of 7,200 learning hours with an average production of 600 learning hours per quarter).  Takamol replied that it could not "accept a minimum scale" for Wave 3.  Fullbridge subsequently agreed to the buffer order "with no conditions," but Takamol never issued it.

Around this time, Fullbridge opened its D-1 financing round.  On October 30, Fullbridge sought a second investment from Paraflon, e-mailing Sarkesian a copy of an investor presentation made earlier that month.  This presentation included statements that Fullbridge had won a "$40mm share of Wave 3" and had a "$40mm 3 year contract with Takamol."  On November 16, Fullbridge followed up with a "Qualitative High Level Summary" stating that it had "recently won a large flywheel contract/award from [the Kingdom of Saudi Arabia], signaling [a] large new pipeline fueling top-line growth over [the] next 2-3 years."[4]

Sarkesian reviewed these documents and decided to invest in the D-1 round chiefly because of Fullbridge's representations about the $40 million Wave 3 award.  He never asked to review documentation relating to the Wave 3 award.  Nor did he visit Fullbridge's "data room," where important documents were made

_____

[4] From time to time, Fullbridge referred to both a Wave 3 "contract" and a Wave 3 "contract/award."  Since nothing turns on this nomenclature, we use the terms interchangeably.

- 10 -

available to investors (but he testified that he was unaware of the data room's existence at the time).

On November 20, Sarkesian made the purchase that gave rise to this litigation: acting for Paraflon, he agreed to buy $750,000 worth of Series D-1 convertible preferred stock. He approved the executed purchase documents, dated November 20, on November 23. The signed documents were forwarded to Fullbridge that day. And on December 1, Paraflon wired the purchase money.

Meanwhile, Takamol had continued to delay finalizing the details of Fullbridge's Wave 3 work. In a November 11 e-mail, Takamol stated that it was "on the final stages to finalize wave III awarding," which it expected "to be completed by [the] end of next week." Roughly two weeks later (on November 26), Takamol informed Fullbridge that it had "reached the final stage for the issuance of the letter of award and subsequent agreement" but Fullbridge would need to accept a maximum of 3,000 learning hours. Fullbridge estimated that this decreased the value of the award from approximately $40 million to approximately $14 million. In addition, Fullbridge interpreted the November 26 e-mail as requiring it to sign a new Framework Agreement.

Fullbridge had little time to dwell on the downside of these developments. Within a matter of months, the Wave 3 project collapsed. In February of 2016, Takamol put the entire project on hold. The death knell was sounded when Takamol later decided to

develop its own courses internally. By April of 2016, Candice Olson was openly bemoaning the "loss of [the] $40mm award."

The parting of the ways between Fullbridge and Takamol did not end the matter. Stung by the deterioration of its investment, Paraflon brought suit against, among other parties, Fullbridge and the Olsons in the United States District Court for the Southern District of New York. It pressed federal securities fraud claims, as well as common law claims for breach of contract, negligent misrepresentation, and fraudulent misrepresentation and concealment. By agreement, the case was transferred to the District of Massachusetts. See 28 U.S.C. § 1404(a).

After the close of discovery, a five-day bench trial ensued. The district court granted Fullbridge's motion for judgment as a matter of law on Paraflon's breach of contract claim, and Paraflon has not appealed this ruling. After trial, the district court took the matter under advisement. In due course, it issued an exegetic rescript, ruling against Paraflon on both its federal securities law claims and its state-law misrepresentation claims.[5] See Paraflon, 2019 WL 3759522, at *12. Pertinently, the court found that Fullbridge "did not knowingly or intentionally make a false statement" and that Fullbridge's

---

[5] For ease in exposition, we sometimes refer to Paraflon's negligent misrepresentation and fraudulent misrepresentation and concealment claims collectively as the "misrepresentation claims."

representation of a $40 million award from Takamol "was not false nor should defendants have known it to be inaccurate at the time it was made." Id. This timely appeal followed. In it, Paraflon challenges only the district court's disposition of the state-law misrepresentation claims against Fullbridge and the Olsons.

## II. ANALYSIS

Following a bench trial, we review the trial court's legal conclusions de novo. See Calandro v. Sedgwick Claims Mgmt. Servs., Inc., 919 F.3d 26, 33 (1st Cir. 2019). We assay the court's factual findings for clear error, deferring to those findings unless careful consideration of the record leaves us with a firm conviction that they "are simply wrong." Id. (quoting State Police Ass'n v. Comm'r, 125 F.3d 1, 5 (1st Cir. 1997)). In undertaking this tamisage, we remain mindful that the trial court "sees and hears the witnesses at first hand and comes to appreciate the nuances of the litigation in a way which appellate courts cannot hope to replicate." Id. (quoting Cumpiano v. Banco Santander P.R., 902 F.2d 148, 152 (1st Cir. 1990)).

In this instance, the district court determined that New York law supplies the substantive rules of decision. Neither side challenges that determination. When a federal court must make a choice of state substantive law, it is at liberty to accept, without particularized inquiry, the parties' reasonable consensus as to which state supplies the substantive rules of decision. See

e.g., Borden v. Paul Revere Life Ins. Co., 935 F.2d 370, 375 (1st Cir. 1991). Thus, we too apply New York law.

Under New York law, a plaintiff alleging negligent misrepresentation must prove by preponderant evidence that the defendant had a duty to impart accurate information to the plaintiff by virtue of a special relationship; that the defendant breached this duty by carelessly imparting false information that he ought to have known was inaccurate; that the defendant understood that the plaintiff would use the information for a particular purpose; and that the plaintiff reasonably relied on this information to his detriment. See Anschutz Corp. v. Merrill Lynch & Co., 690 F.3d 98, 114 (2d Cir. 2012); Mandarin Trading Ltd. v. Wildenstein, 944 N.E.2d 1104, 1109 (N.Y. 2011); White v. Guarente, 372 N.E.2d 315, 319 (N.Y. 1977); Wrynn v. Subaru Town Motors, Inc., 487 N.Y.S.2d 247, 247 (App. Term 1984). For a claim of fraudulent misrepresentation, New York law provides a somewhat different framework. With respect to such a claim, the plaintiff must prove by clear and convincing evidence that the defendant knowingly or recklessly made a false representation of material fact; that the defendant made the misrepresentation with the intent of inducing the counter-party's reliance; and that the counter-party justifiably relied on the misrepresentation to his detriment. See Merrill Lynch & Co. v. Allegheny Energy, Inc., 500 F.3d 171, 181 (2d Cir. 2007); Mandarin Trading, 944 N.E.2d at 1108.

- 14 -

The first of these elements may also be satisfied by showing an omission of material information "that the opposing party had a duty to disclose." Ahern v. Scholz, 85 F.3d 774, 793 (1st Cir. 1996); see Merrill Lynch, 500 F.3d at 181; P.T. Bank Cent. Asia v. ABN AMRO Bank N.V., 754 N.Y.S.2d 245, 250 (App. Div. 2003). The parties appear to agree that such omissions also can give rise to negligent misrepresentation claims. See Creative Waste Mgmt., Inc. v. Capitol Envtl. Servs., Inc., 429 F. Supp. 2d 582, 609 (S.D.N.Y. 2006). A duty to disclose may attach if the parties are "in a fiduciary or confidential relationship"; if disclosure is necessary to correct or complete an earlier "partial or ambiguous statement"; or if one party enjoys an informational advantage and knows another party is acting on the basis of bad information. Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993).

We pause to note an important doctrinal wrinkle. Under New York law, an investor's claim that a defendant fraudulently induced its investment generally cannot rest on misrepresentations or omissions that postdate the investment because the element of detrimental reliance is "necessarily absent." High Tides, LLC v. DeMichele, 931 N.Y.S.2d 377, 381 (App. Div. 2011); see RKA Film Fin., LLC v. Kavanaugh, 99 N.Y.S.3d 267, 270 (App. Div. 2019). This principle has equal bite with respect to negligent misrepresentation claims, which likewise require proof of reasonable reliance. See Mandarin Trading, 944 N.E.2d at 1109.

- 15 -

Against this backdrop, Paraflon marshals three separate lines of attack.[6]  Each line of attack centers on the district court's findings about Fullbridge's state of mind.[7]  First, Paraflon argues that the district court misidentified the correct cut-off date for Fullbridge's duty to disclose and, by extension, assessed Fullbridge's state of mind at the wrong temporal moment. Second, Paraflon argues that the district court cabined its assessment of Fullbridge's state of mind to Fullbridge's subjective belief in a Wave 3 contract, failing to evaluate whether that belief was objectively reasonable.  Third, Paraflon argues that any finding that Fullbridge reasonably believed it had a $40 million contract was erroneous.  We address these arguments sequentially.

We start with Paraflon's contention that the district court botched its assessment of the misrepresentation claims by

[6] To the extent that Paraflon has attempted to raise other arguments along the way, those arguments are undeveloped, meritless, or both.  Thus, we reject them out of hand.

[7] The parties use the phrase "state of mind" to refer to the element of negligent misrepresentation requiring proof that the defendant "should have known" that its representation was inaccurate. Anschutz, 690 F.3d at 114 (quoting Hydro Inv'rs, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000)).  They use the same term to refer to the element of fraudulent misrepresentation requiring proof that the defendant knowingly or recklessly made a false statement with the intent to induce reliance by the counter-party (scienter).  See Merrill Lynch, 500 F.3d at 181; Mandarin Trading, 944 N.E.2d at 1108.  To avoid confusion, we follow the parties' lead and employ the same terminology where appropriate.

treating the date of Fullbridge's initial representation that it had a $40 million contract (October 30), rather than the date of Paraflon's D-1 investment, as the end point for evaluating Fullbridge's state of mind and the fulfillment of its disclosure duties. By misapprehending this pivotal date, Paraflon's thesis runs, the district court excluded from its decisional calculus various pre-investment events that Fullbridge either should have disclosed or that bore on its state of mind at the time of Paraflon's investment. Before embarking on this circuitous path, we offer a brief primer on pertinent New York precedent and note the applicable standards of review.

When — as in this case — a plaintiff alleges that the defendant's misrepresentations or omissions induced its investment, New York law indicates that the defendant's state of mind and satisfaction of its disclosure duties should be assessed up until the date of the plaintiff's investment. Cf. High Tides, 931 N.Y.S.2d at 381 (framing plaintiff's investment as temporal touchstone for determining whether misrepresentations or omissions can form basis for fraud claims). Even if post-investment developments might be said to trigger some disclosure duty on the defendant's part, see Brass, 987 F.2d at 150, misrepresentations or omissions about such events are generally of no consequence in an action premised on fraudulent inducement of an investment. See

- 17 -

<u>High Tides</u>, 931 N.Y.S.2d at 381 (explaining that in such a situation, detrimental reliance is "necessarily absent").

New York courts have not been crystal clear about when an investment should be deemed to have occurred for purposes of misrepresentation claims. This question becomes especially thorny where, as here, the plaintiff arguably bound itself to participate in the transaction as an investor before the transaction was formally consummated in all respects. What little precedent there is, though, suggests that, in this context, an investment should be deemed to have occurred once the plaintiff has decided to invest and bound himself to the transaction sufficiently that subsequent developments cannot be said to have influenced his already-solidified investment decision. <u>Cf.</u> <u>id.</u> (holding that post-investment misrepresentations and omissions cannot form basis for fraud claims). Contrary to Paraflon's importunings, we think this pivotal date may, under the right factual circumstances, occur earlier than the technical consummation of all aspects of the transaction.

Turning to the applicable standards of review, we review de novo whether the district court, as a matter of law, apprehended that the date of Paraflon's investment was the relevant cut-off date for assessing Fullbridge's state of mind. <u>See</u> <u>Calandro</u>, 919 F.3d at 33; <u>see</u> <u>also</u> <u>United States</u> v. <u>15 Bosworth St.</u>, 236 F.3d 50, 54 (1st Cir. 2001) ("[W]hen a trial court bases its findings

of fact on an inaccurate appraisal of controlling legal principles, the rationale for deference [to those findings] evaporates entirely."). If so, we then must determine what finding, if any, the district court made about the date of Paraflon's investment decision. Because the precise timing of a particular investment is a factbound determination that can only be made after a holistic assessment of the specific purchase documents and the attendant circumstances, cf. Crellin Techs., Inc. v. Equipmentlease Corp., 18 F.3d 1, 7 (1st Cir. 1994) ("[S]o long as the evidence does not point unerringly in a single direction . . . the question of whether a contract has been formed between two parties is a question of fact to be determined by the factfinder."), we review any factual finding about the timing of Paraflon's investment only for clear error, see Calandro, 919 F.3d at 35.

We begin with a de novo inquiry into whether the district court, as a matter of law, grasped the pivotal cut-off date for appraising Fullbridge's state of mind. In mounting this inquiry, we are quick to acknowledge that the district court was not altogether clear as to its temporal focal point. Taken in isolation, a few of the court's findings may be read to suggest that the court confined its conclusions to the period demarcated by Fullbridge's October 30 representations. See, e.g., Paraflon, 2019 WL 3759522, at *10-12. This suggestion is given a boost by the court's citation to an unpublished decision that may be read

to suggest that a defendant's state of mind need only be evaluated as of the time of the alleged misrepresentation. See id. at *10, *12 (citing IP Cube Partners Co. v. Telecomm. Sys., Inc., No. 15 CV 6334, 2016 WL 3248500, at *2 (S.D.N.Y. June 13, 2016) ("An essential element of both fraud and negligent misrepresentation is that the defendant knew or should have known that its statements were false at the time they were made.")).

But elsewhere in its rescript, the court clarified its thinking. Citing pertinent New York precedent, it twice singled out the date of investment as the pivotal moment. See id. at *10-11 (citing High Tides, 931 N.Y.S.2d at 381). Take, for instance, its extended discussion of Takamol's November 26 e-mail reducing the size of the Wave 3 award to approximately $14 million. Noting that "Paraflon had purchased the stock on November 20" and "executed the purchase agreement on November 23," the court held that "even assuming that [Fullbridge] had a duty to disclose the reduction in the award after the purchase," that disclosure would have "had no bearing on Paraflon's initial decision to invest in Fullbridge." Id. at *11 (citing High Tides, 931 N.Y.S.2d at 381).

Although the court mentioned in passing that Paraflon's "decision to invest" had occurred "a month prior to the [November 26] e-mail," the surrounding context makes reasonably clear that the court viewed that initial investment decision as merely tentative and the final (analytically significant) investment

decision as having occurred in November.[8]  Id.; see id. at *6-7.
This sequencing is consistent with real-world business practices:
prospective investors typically make a preliminary decision to go
forward because a given investment looks promising but withhold
their final decision — usually evidenced by signing on the dotted
line — until the details of the investment are in place.  Given
the realities of the marketplace, the court's invocation of the
November purchase dates and its apparent understanding that
Paraflon's actual investment decision occurred in November
persuade us that it deemed the November 26 e-mail inconsequential
because that e-mail was transmitted after Paraflon had already
committed itself to the investment.

In all events, any lingering concern that the district
court froze its analysis at October 30 is dispelled by the court's
factual findings anent November events and its reliance on a number
of those findings in reaching its conclusions.  See, e.g., id. at
*4-7, *11.  Taking the court's rescript as a whole, it makes

---

[8] For example, as we read its rescript, the district court
made a finding that Sarkesian reviewed both the October 30 investor
presentation and the summary chart that Fullbridge provided on
November 16 before deciding to invest in the D-1 round of
financing.  See Paraflon, 2019 WL 3759522, at *6.  In addition,
the court sandwiched its suggestion that Paraflon had made some
sort of decision to invest in October between a citation to this
finding and a reference to another finding that Paraflon had
purchased the D-1 stock on November 20.  See id. at *11.  Taken
together, these findings and surrounding statements help to refute
any suggestion that the court treated Paraflon's actual investment
decision as having occurred in October.

reasonably evident that the court did not mean to limit the temporal parameters of its conclusions to October 30.

We add a coda. When a district court presides over a bench trial in a complex case and makes lengthy findings, some imprecision is not uncommon. Where such imprecision exists, a reviewing court ordinarily should attempt to resolve any uncertainty by construing that court's findings and conclusions as a whole. Cf. Calandro, 919 F.3d at 31 ("Bench trials evoke a deferential standard of review."). Here, a careful review of the totality of the district court's findings and conclusions makes manifest that the court did not stop the analytical clock at October 30 but, rather, treated the time of Paraflon's actual investment decision (November 20-23) as the cut-off for assessing Fullbridge's state of mind.

As we read its rescript, the district court unarguably found that Paraflon purchased the D-1 stock on November 20 and executed the purchase agreement on November 23. See Paraflon, 2019 WL 3759522, at *7, *11. Additionally, the court indicated that those November dates were more significant than December 1 (when Paraflon wired its D-1 purchase money). See id. at *11 ("While the funds were wired on December 1, 2015, Paraflon had purchased the stock on November 20, 2015, and had executed the purchase agreement on November 23, 2015."). And because there is no material difference between the November 20 date and the

November 23 date with respect to either Fullbridge's state of mind or its disclosure duties, we will assume, favorably to Paraflon, that the court found the later date to be the date of Paraflon's D-1 investment.

The next question, of course, is whether this finding is supportable as a matter of fact. As we have said, findings about when particular investments occur are "ineluctably factbound" and, thus, reviewable only for clear error. Calandro, 919 F.3d at 35. We discern nothing resembling clear error here.

To begin, by "execut[ing] and deliveri[ng]" the investor signature page in the D-1 stock purchase agreement on November 23, Paraflon "agree[d] to be bound by and be a party to" the agreement as an investor "as of the date set forth" on the signature page (November 20). While the agreement specifies elsewhere that sales of securities can only be "consummated" by Fullbridge's "acceptance of offers to purchase" stock, the undisputed evidence of Fullbridge's earnest solicitation of Paraflon's investment supports an inference that Fullbridge's acceptance was a foregone conclusion. And even though Paraflon did not wire the purchase money until December 1, its counsel essentially conceded at oral argument that, absent fraud or misrepresentation prior to the execution of the agreement, it had no ability to renege on the transaction once it forwarded the investor signature page on November 23.

We add, moreover, that the district court premised its finding about the date of Paraflon's investment in part on Paraflon's own pretrial stipulation that it "purchased" the D-1 stock on November 20 and in part on undisputed evidence showing that Sarkesian directed the transmittal of the executed purchasing documents to Fullbridge on November 23. Paraflon, 2019 WL 3759522, at *7. The district court was free to factor these considerations into its decisional calculus. See Chao v. Hotel Oasis, Inc., 493 F.3d 26, 32 (1st Cir. 2007); T I Fed. Credit Union v. DelBonis, 72 F.3d 921, 928 (1st Cir. 1995).

To cap the matter, Paraflon itself suggested in its opening brief that November 23 was the date on which a "meeting of [the] minds on all essential terms" occurred between Paraflon and Fullbridge. We conclude, therefore, that the district court's finding that Paraflon made its actual investment decision and bound itself to the transaction as of November 23 was not clearly erroneous. It follows that any subsequent misrepresentations or omissions could not be said to have induced its investment. See RKA Film Fin., 99 N.Y.S.3d at 270; High Tides, 931 N.Y.S.2d at 381.

Paraflon resists this conclusion, seizing on the stock purchase agreement's provision that sales of D-1 stock could not be "consummated" until Fullbridge accepted Paraflon's purchase offer. With this in mind, Paraflon contends that Fullbridge did

not accept its investment until the D-1 round officially closed on January 22, 2016.  The rub, though, is that Paraflon never argued below that January 22 should be deemed the pivotal date on which its D-1 investment occurred.  "If any principle is settled in this circuit, it is that, absent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal." Teamsters Union, Local No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992). The circumstances here are not extraordinary and, thus, Paraflon's belated argument is foreclosed.

In an effort to pull a large rabbit out of a small hat, Paraflon launches an alternative argument.  It presents December 1 (when it wired its D-1 purchase funds) as the next most plausible date on which its investment should be deemed to have occurred. The district court rejected this alternative argument, see Paraflon, 2019 WL 3759522, at *11, and so do we.  Paraflon has failed to offer any persuasive reasoning as to why the factfinder was obliged to privilege the date on which Paraflon wired its purchase funds over the dates on which it effectively bound itself to participate in the transaction.

This brings us to Paraflon's complaint that the district court mistakenly evaluated Fullbridge's state of mind as of October 30, instead of evaluating it as of November 23.  As we explain below, this complaint is unavailing.

To be sure, the district court — in elaborating upon its conclusion that the "[d]efendants did not act with the intent to deceive or with reckless disregard for the truth" — found that "in October of 2015, [the] defendants reasonably believed, and had a good faith basis for representing, that Fullbridge had been awarded $40 million of business over three years from Takamol." Id. But rejecting any inference that Fullbridge's financial troubles prompted it to mislead investors either "purposefully or recklessly," the court went on to find that Fullbridge "acted from August through November of 2015 consistently with the belief that it would receive the $40 million award from Takamol." Id. We think it apparent that the "belief" found by the court was a reasonable, good-faith belief in the $40 million award. Id. What is more, the court found that this belief persisted notwithstanding Fullbridge's difficulties in securing written confirmation from Takamol — difficulties that (as the court's accompanying citation to an earlier factual finding made clear) continued into November. See id.

Taking these state-of-mind findings in the aggregate, we are satisfied that the district court intended those findings to capture more than the period ending October 30. In our view, the totality of the court's statements on the subject amount to an implicit finding that Fullbridge reasonably believed it had been awarded a $40 million portion of Wave 3 and that such a belief

- 26 -

persisted through November 23.  It was not until November 26 (when Takamol reduced the Wave 3 award and made clear that Fullbridge would be required to sign a Framework Agreement) that Fullbridge's hopes were dashed.  See id.

We recognize, of course, that the district court's decision is not a model of clarity.  But "[b]ench trials evoke a deferential standard of review," Calandro, 919 F.3d at 31, and wherever possible, we afford the district court's findings a generous reading.  Employing "this respectful standard," we are satisfied that the court below made at least an implicit finding about Fullbridge's state of mind at the time of Paraflon's investment.  Id.

Battling on, Paraflon contends that the district court failed to consider certain events, postdating October 30, that bore upon Fullbridge's state of mind and duty to disclose.  This contention is woven out of whole cloth.

At least three of the items on Paraflon's list of "omitted" events — the November 26 e-mail, Takamol's subsequent failure to make any "commitments to Fullbridge," and Fullbridge's use of Paraflon's investment to defray basic operating expenses — occurred after Paraflon's investment on November 23.  Thus, none of these developments could have influenced Paraflon's investment decision.  See RKA Film Fin., 99 N.Y.S.3d at 270; High Tides, 931 N.Y.S.2d at 381; see also Paraflon, 2019 WL 3759522, at *11

- 27 -

(recognizing this reality with respect to the November 26 e-mail). And since Paraflon has not advanced a plausible claim that any of these events evinced pre-investment misrepresentation or concealment, they cannot breathe life into Paraflon's misrepresentation claims.

We also give no weight to Paraflon's allusion to a conversation "[s]ometime before November 26" in which Takamol supposedly informed Fullbridge "that the scope of Wave 3 was being reduced" by some unspecified amount. For one thing, there is no evidence establishing that this conversation, if it occurred at all, took place before the November 23 cut-off date. For another thing, the allusion is untimely: Paraflon never argued below that this conversation either should have been disclosed or was in some way revelatory of Fullbridge's state of mind.[9] Arguments not raised below are typically deemed abandoned, see Teamsters Union, 953 F.2d at 21, and so it is here.

---

[9] In a post-argument letter purporting to pinpoint a place in the record where such an argument was raised below, Paraflon gestured only to a trial exhibit — buried in a voluminous record — which references this conversation. That unelaborated reference does not advance Paraflon's cause. To preserve an argument "for appeal, some developed argumentation must be put forward in the nisi prius court." B & T Masonry Constr. Co. v. Pub. Serv. Mut. Ins. Co., 382 F.3d 36, 40 (1st Cir. 2004). The obligation to spell out an argument clearly and distinctly is not satisfied by inviting the trial court "to ferret out an evanescent needle from an outsized paper haystack." Rivera-Gomez v. de Castro, 843 F.2d 631, 635 (1st Cir. 1988).

This leaves two other events that Paraflon suggests the district court may have overlooked. The first such event is a November 9 e-mail from Ramón Rivera, Fullbridge's chief financial officer, acknowledging that Fullbridge had been unable to secure confirmation of the Wave 3 award from Takamol. The second is Takamol's November 11 e-mail telling Fullbridge that it was "on the final stages to finalize wave III awarding," which it expected to be completed shortly. Despite Paraflon's self-serving attempt to characterize these events as missing pieces of the puzzle, the record reflects that they were part and parcel of the district court's decisional calculus.

With respect to the November 9 e-mail, the district court made a specific factual finding and cited that finding twice when rendering its conclusions. See Paraflon, 2019 WL 3759522, at *4, *11. And even though the district court did not make a specific finding concerning the November 11 e-mail, it heard testimony that Fullbridge understood Takamol's statement about "finaliz[ing] wave III awarding" as a reference only to the finalization of the second layer of Wave 3 details. We do not assume "that the trial judge slept through the trial" simply because his opinion does not explicitly address every scintilla of evidence. Richard v. Reg'l Sch. Unit 57, 901 F.3d 52, 59 (1st Cir. 2018). As long as the trial court makes the basis for its disposition of a case reasonably clear, it is not obliged to respond, piece by piece, to

- 29 -

each evidentiary fragment.  See Nevor v. Moneypenny Holdings, LLC, 842 F.3d 113, 119 (1st Cir. 2016).  We think that this tenet effectively disposes of any contention that the district court committed reversible error by failing to comment specifically on the November 11 e-mail.  See Richard, 901 F.3d at 59 (observing that trial court need not "expressly respond like a debate champion to every evidentiary or factual contention made by the losing side").

Next, Paraflon challenges the scope of the district court's state-of-mind findings.  Paraflon insists that the court only made findings about Fullbridge's subjective belief in a $40 million contract, without inquiring into the objective reasonableness of that belief.  Specifically, Paraflon argues that for purposes of its negligent misrepresentation claims, the court ought to have inquired into what Fullbridge "should have known." Anschutz, 690 F.3d at 114 (quoting Hydro Inv'rs, Inc. v. Trafalgar Power, Inc., 227 F.3d 8, 20 (2d Cir. 2000)).

This argument is fruitless:  it ignores the district court's unequivocal finding that there was insufficient proof that Fullbridge "should . . . have known" that its representation about the contract was "inaccurate at the time it was made."  Paraflon, 2019 WL 3759522, at *12.  Here, moreover, that finding was buttressed by other findings that Fullbridge "reasonably believed" that it had received the award and that it had "a good faith basis

- 30 -

for representing . . . [it] had been awarded $40 million of business over three years." Id. at *11. And as we have explained, a holistic evaluation of the court's state-of-mind findings reveals an implicit finding that Fullbridge maintained this good-faith belief through November 23. See id. Seen in this light, the futility of Paraflon's plaint that the district court failed to evaluate the objective reasonableness component of its negligent misrepresentation claims becomes starkly apparent.

Paraflon also asserts that the district court dispensed with its fraud claim "based on a cramped understanding of scienter," accusing the court of focusing exclusively on whether Fullbridge intentionally induced Paraflon's investment by knowingly misrepresenting the existence of a $40 million contract. In Paraflon's estimation, the court utterly failed to assess whether Fullbridge acted with reckless disregard for the truth. See Bd. of Educ. v. Sargent, Webster, Crenshaw & Folley, 539 N.Y.S.2d 814, 820 (App. Div. 1989); Burgundy Basin Inn, Ltd. v. Watkins Glen Grand Prix Corp., 379 N.Y.S.2d 873, 879 (App. Div. 1976). Once again, the district court's findings refute Paraflon's assertions.

Most importantly, the district court twice rebuffed the notion that Fullbridge acted recklessly by representing that it had a $40 million contract with Takamol. See Paraflon, 2019 WL 3759522, at *11. Although the court did not use the buzz words

that Paraflon touts — in particular, it did not comment upon whether Fullbridge made only a "pretense of knowledge," DiRose v. PK Mgmt. Corp., 691 F.2d 628, 632 (2d Cir. 1982) (quoting Ultramares Corp. v. Touche, 174 N.E. 441, 444 (N.Y. 1931)); Bd. of Educ., 539 N.Y.S.2d at 820 — its findings that Fullbridge "reasonably believed" that it had received the award and "had a good faith basis" for its representation to Paraflon fairly encompass this point, Paraflon, 2019 WL 3759522, at *11. While a trial court sitting without a jury must make its findings reasonably clear, there is no general requirement that it use particular words or pet phrases in performing such a task. Cf. Valsamis v. González-Romero, 748 F.3d 61, 63 (1st Cir. 2014) (observing, in context of a Federal Rule of Civil Procedure 52(a)(1) challenge, that "substance trumps form").

Endeavoring to change the trajectory of the debate, Paraflon submits that to the extent the district court reached "bare conclusion[s]" about objective reasonableness, those conclusions are so tersely stated and thinly supported that they frustrate meaningful judicial review. We do not agree: the basis for the challenged findings is readily apparent from context. For example, the court discussed, in close proximity to its findings about objective reasonableness, Takamol's statements in the August 17 meeting, Takamol's averment that the Master Agreement would govern Fullbridge's work on Wave 3, Takamol's "performance first

- 32 -

and paper later" philosophy, and what it found to be the "credible testimony" of Fullbridge representatives. Paraflon, 2019 WL 3759522, at *11. The court also made pellucid that it had factored into the mix Fullbridge's struggle to secure written confirmation of the Wave 3 award, Fullbridge's activities from and after August, and AlHashimi's repeated assurances that the Wave 3 deal remained viable. See id.

No more was exigible. Following a bench trial, a district court "need only make brief, definite, pertinent findings and conclusions." Fed. R. Civ. P. 52(a), advisory committee's note to 1946 amendment. "[T]here is no necessity for over-elaboration of detail or particularization of facts." Id. Where, as here, "'the district court's decision contains sufficient findings and reasoning to make plain the basis for its disposition of the case,' we pay little heed to claims that it should have done more." Richard, 901 F.3d at 59 (quoting Valsamis, 748 F.3d at 63). We are especially reluctant to entertain such claims when — as in this case — the complaining party never moved for additional findings under Federal Rule of Civil Procedure 52(b). See Irving Tanning Co. v. Kaplan, 876 F.3d 384, 390 (1st Cir. 2017).

The upshot is that the court below made its findings reasonably clear — certainly clear enough to permit meaningful appellate review. No useful purpose would be served by requiring

it to add hues to a sufficiently vivid rainbow. We do pause, however, to address Paraflon's repeated references to the district court's suggestion that Fullbridge "may have" engaged in "a heaping ration of wishful thinking" when forming its belief that it had landed the $40 million contract. Paraflon, 2019 WL 3759522, at *11. This remark simply cannot bear the analytical import that Paraflon attempts to attribute to it. In fairness, the remark must be read in conjunction with the court's findings that throughout the relevant period, Fullbridge maintained a sincere and objectively reasonable belief in the $40 million award. See id. at *11-12. Such an integrated reading makes luminously clear the court's view that although Fullbridge may have indulged some wishful thinking, it nonetheless operated under a reasonable, good-faith belief in its securing of the $40 million award. See id.

The last leg of our journey takes us to Paraflon's asseveration that no objectively reasonable person could have thought, as late as November 23, that Fullbridge had a $40 million award from Takamol. We review factual findings related to scienter and objective reasonableness for clear error. See Calandro, 919 F.3d at 36; Brotherston v. Putnam Invs., LLC, 907 F.3d 17, 27 (1st Cir. 2018), cert. denied, 140 S. Ct. 911 (2020); Healey v. Chelsea Res., Ltd., 947 F.2d 611, 618 (2d Cir. 1991); ACA Fin. Guar. Corp. v. Goldman, Sachs & Co., 15 N.Y.S.3d 764, 766 (App. Div. 2015).

- 34 -

We conclude that the court below did not clearly err in finding that Fullbridge reasonably believed it had been awarded a $40 million slice of Wave 3. Nor did the court commit clear error in finding that Fullbridge did not act recklessly by representing to investors that it had received a $40 million award. We explain briefly.

The district court's state-of-mind findings, fairly construed, rest largely on its decision to credit the trial testimony of the Olsons and other Fullbridge witnesses. Of central importance, the court gave credence to the Olsons' testimony that Takamol informed Fullbridge it had been awarded a sizable portion of the Wave 3 project, agreed to the broad terms of a deal (amounting to a projected $40 million in revenue), and left open for negotiation a second layer of more granular details within that broad framework. So, too, the court credited testimony that Fullbridge's past working relationship with Takamol was characterized by Takamol's "perform now, paper later" ethos, resulting in Fullbridge's commencement of work on Wave 1 before the execution of the Master Agreement and on other projects months before the issuance of formal work orders. Finally, the court credited testimony that Takamol had informed Fullbridge that the Master Agreement would govern its work on Wave 3 and that Fullbridge believed it would not be required to negotiate a new Framework Agreement.

Paraflon views much of this testimony with a jaundiced eye, regarding it as suspect and in tension with its interpretation of the documentary evidence. But credibility determinations are, within wide limits, grist for the trial court's mill. See Calandro, 919 F.3d at 35. As we repeatedly have said, "weighing the evidence and assessing the witnesses' credibility is uniquely the province of the district court." Fed. Refinance Co. v. Klock, 352 F.3d 16, 29 (1st Cir. 2003).

Nor does Paraflon's reliance on various items of documentary evidence get it very far. Much of the documentary evidence to which Paraflon points is capable of supporting competing inferences relating to Fullbridge's state of mind at the time of Paraflon's November 23 investment. A few examples suffice:

- Fullbridge's internal minutes from the August 17 meeting and associated e-mails could support an inference that Fullbridge understood (or should have understood) that the parties had only discussed a tentative pricing benchmark that was entirely dependent on further negotiations. But by the same token, these minutes could be viewed as consistent with the Olsons' testimony that the parties had reached a firm agreement on broad terms and left open only a second layer of granular details within that framework.

- Takamol's evasion of Fullbridge's requests for written confirmation of the Wave 3 award could be viewed as foreboding signs that its representations on August 17 had been far from ironclad or conversely (as the Olsons testified and the district court apparently found) could be viewed as altogether typical manifestations of Takamol's modus operandi (perform now, paper later).

- Competing inferences could also be gleaned from Peter Olson's October 20 e-mail seeking "a sense of the exact timing and courses designated" and Takamol's October 22 response stating that although "things [were] moving in the right direction," it could not give a specific timetable for Wave 3; the e-mails surrounding Takamol's October 24 proposal for a buffer order and fixed price agreement; and Takamol's November 11 e-mail stating that it was "on the final stages to finalize wave III awarding."

The short of it is that, on this scumbled record, rational factfinders could have reached different conclusions about whether it was objectively reasonable for Fullbridge to believe (and, thus, represent) that it had a $40 million award for Wave 3 as of November 23. Which conclusion appealed to a

particular factfinder would depend largely on how the factfinder viewed not only Fullbridge's explanation of the documentary evidence but also the credibility of various witnesses. Thus, the case at hand falls squarely within the maxim that when a factfinder is confronted by "two permissible views of the evidence," the "choice between those competing views cannot be clearly erroneous." Id. It was for the district court to weigh the evidence and decide whether Fullbridge should have realized, on or before November 23, that its representations about a $40 million award were overly optimistic. So, too, it was for the district court to decide whether Fullbridge acted with fraudulent intent, a reckless disregard for the truth, or a false pretense of knowledge by making these representations. The district court acquitted its responsibilities adequately, and its findings pass muster under clear-error review.

## III. CONCLUSION

We need go no further. The decisive question here is not whether we, if writing on a pristine page, would have resolved this dispute in the same way as the district court. What matters, we think, is that we discern no clear error in the district court's determination that, as of November 23, Fullbridge had a good-faith belief that it had received the lucrative award from Takamol. Of equal significance, we discern no clear error in the district court's determination that Fullbridge's good-faith belief was

objectively reasonable based on its experience with Takamol and
what it knew at the time of Paraflon's investment.  Given these
determinations and the impotence of Paraflon's various claims of
error, the judgment of the district court must be

**Affirmed.**